Exhibit 3

*Cynthia Jimenez v Microsoft Corporation et al*

U SDC – Southern District of Illinois (East St. Louis)

Civil Docket No.: 3:23-cv-03678- SPM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
### EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| CYNTHIA JIMENEZ, Individually and on Behalf of I.C., a Minor, | ) ) ) | Case No.: _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| MICROSOFT CORPORATION; EPIC GAMES, INC.; ROBLOX CORPORATION; MOJANG STUDIOS; NINTENDO OF AMERICA, INC.; and GOOGLE LLC, | ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Cynthia Jimenez, Individually and on Behalf of I.C., a Minor, hereby file their *Complaint* against the Defendants—Microsoft Corporation; Epic Games, Inc.; Roblox Corporation; Mojang Studios; Nintendo of America, Inc.; and Google LLC—notifying each Defendant of Plaintiffs' claims for relief as available under Illinois law. In support thereof, Plaintiffs allege and state:

## I.   NATURE OF THE ACTION

1.     Video game addiction, also called internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school, and work.

2.     Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering often stop interacting with friends and family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.      Video game addiction causes rifts between gaming-addicted minors and young adults and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.     Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.     Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.     The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, game players) addicted to the Defendants' video games in order to maximize Defendants' profits.

7.     Defendants manufactured, published, marketed, and sold video games and gaming products, including those played by I.C., which Defendants had ***specifically developed and designed*** to cause the addiction experienced by I.C. and other users.

8.     Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.     Defendants rely on microtransactions to increase their profits from individual

2

games.

10. Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors and young adults.

11. Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game software is their own bottom line.

12. By making their games addictive, Defendants are able to maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game content or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

13. "Microtransactions" often occur as a result of Defendants' use of "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times they are subjected to Defendants' deceptive and harmful conduct and more likely to spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

14. By keeping minors and young adults playing longer—and spending more in the game in the process—Defendants are consistently increasing their revenue.

15. By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these young users age.

16. Defendants are exploiting consumers, particularly minors and young adults, through the use of unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

3

17. Video game addiction impacts thousands of youths and their families across the country, including in Illinois.

18. I.C. and their legal guardian, Cynthia Jimenez, are one of those families who have been negatively impacted by the addiction caused by each of Defendants' products.

19. Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused I.C.'s gaming addiction and other damages, as described herein.

20. As a result of gaming addiction, I.C. specifically has experienced severe emotional distress, physical injuries, diminished social interactions, lack of interest in other hobbies and sports, withdrawal symptoms such as rage, anger, and physical outburst, and diagnoses of attention deficit hyperactivity disorder (ADHD) and Depression.

21. As a result of gaming addiction, I.C. requires treatment that includes medication therapy, out-patient counseling, and an Individualized Education Plan ("IEP") at school.

22. As a result of I.C.'s gaming addiction, Cynthia Jimenez has been the recipient of gamer's rage and withdrawal symptoms which instills fear in Cynthia Jimenez. She has personally experienced emotional distress, pain, suffering, mental anguish and loss of money as a proximate result of Defendant's misconduct.

23. Plaintiffs have been injured and harmed as a proximate result of Defendants' actions and misconduct; for that they are entitled to compensation and other damages under Illinois law.

24. Defendants, individually and collectively, have willfully and knowingly engaged in fraudulent, deceptive, unfair, immoral, outrageous, wanton, and reckless behavior that damaged and continues to harm not only Plaintiffs, but countless other Illinoisians and citizens of the world. For this they should be punished and punitive damages should be assessed against each Defendant

4

for their respective misdeeds and unlawful conduct.

## II.   PARTIES

25.    I.C., a minor, is and at all times relevant to this action, was a citizen and resident of the State of Illinois whose principal place of residence is in Marion County, Illinois.

26.    I.C. is 14 years old at the time of filing of this lawsuit.

27.    I.C. began playing video games when they were seven (7) years old—and specifically Defendants' games in 2016—and has continued to play video games at an increasing and uncontrollable pace since that time.

28.    I.C. played the following of Defendants' games: Fortnite, Roblox, and Minecraft.

29.    I.C. downloaded the games through Nintendo eShop or Google Play and plays them through Nintendo Switch and/or their Samsung phone.  I.C. also plays various games through discs on his Xbox 360.

30.    Plaintiff Cynthia Jimenez is, and at all times relevant to this action was, a citizen and resident of the State of Illinois whose principal place of residence is in Marion County, Illinois.

31.    Cynthia Jimenez is the legal guardian of I.C. and represents I.C.'s interests in this lawsuit. She also seeks redress on her own behalf, seeking damages for emotional distress, mental anguish, pain and suffering, as well as for economic injuries and other financial losses sustained as a result of I.C.'s gaming addiction, proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts.

32.    Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, NC 27518. Epic Games is authorized to do and does business in the State of Illinois. Epic Games's registered agent for service of process in the State of Illinois is C T Corporation System, 208 So LaSalle St., Suite 814, Chicago, IL

60604-1101.

33.     At all times material hereto, Epic Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Fortnite series, either directly or indirectly, to members of the general public within the State of Illinois, including Plaintiffs.

34.     Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, CA 94403.

35.     At all times material hereto, Roblox Corp. developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Roblox series, either directly or indirectly, to members of the general public within the State of Illinois, including Plaintiffs.

36.     Defendant Mojang Studios is Swedish Company with its principal place of business in Stockholm, Sweden.

37.     At all times material hereto, Mojang Studios developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Minecraft series, either directly or indirectly, to members of the general public within the State of Illinois, including Plaintiffs.

38.     Defendant Microsoft Corp. ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052. Microsoft is authorized to and does business in the State of Illinois. Microsoft's registered agent for service of process is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

39.     At all times material hereto, Microsoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

the video gaming Minecraft series and the Xbox 360 console, either directly or indirectly, to members of the general public within the State of Illinois, including Plaintiffs.

40.    Microsoft and Mojang Studios acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Minecraft series with all the addictive features and technologies contained therein.

41.    In September 2014, Microsoft acquired Mojang Studios and the Minecraft intellectual property for $2.5 billion.[1] This acquisition has no impact on Mojang Studio's liability for the harm it caused Plaintiffs, and Microsoft is responsible for any damages that may be assessed against Mojang Studios.

42.    Defendant Nintendo of America, Inc. ("Nintendo") is a Washington corporation with its principal place of business located at 4600 150th Avenue NE, Redmond, WA 98052-5113. Nintendo's registered agent for service of process in the State of Illinois is C T Corporation System, 208 So LaSalle St., Suite 814, Chicago, IL 60604-1101. Nintendo is a wholly owned subsidiary of Nintendo Co. Ltd., a Japanese company with its principal place of business in Kyoto, Japan.

43.    At all times material hereto, Nintendo developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Nintendo Switch console and the Nintendo eShop either directly or indirectly, to members of the general public within the State of Illinois, including Plaintiffs.

44.    Nintendo acted in concert with Epic Games, Mojang Studios, and Microsoft to distribute, market, supply, and/or sell the Fortnite and Minecraft video games and all in-game

---

[1] *See Minecraft is Now Part of Microsoft, and it Only Cost $2.5 Billion*, TIME, https://time.com/3377886/microsoft-buys-mojang/ (Sept. 15, 2014).

downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

45.    Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Pkwy., Mountain View, CA 94043.  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business at 1600 Amphitheatre Pkwy., Mountain View, CA 94043, and is a wholly owned subsidiary of the publicly traded company Alphabet Inc.  Google LLC is the primary operating subsidiary of Alphabet Inc.

46.    At all times material hereto, Google developed, tested, patented, manufactured, published, labeled, prepared, distributed, marketed, and/or supplied the Google Play platform on Android phones either directly or indirectly, to members of the general public within the State of Illinois, including Plaintiffs.

47.    Google acted in concert with Roblox Corp., Mojang Studios, and Microsoft to distribute, market, supply, and/or sell the Roblox and Minecraft video games and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

48.    Upon information and belief, each Defendant was aware—or should have been aware—that other game developers and publishers, including the other Defendants named herein, were engaging in the same behavior.

49.    Upon information and belief, Microsoft, Epic Games, Roblox Corp., Mojang Studios, Nintendo, and Google, all acted in concert and entered into licensing agreements to utilize the same patents to keep users, including minors like I.C., addicted to Defendants' video games.

50.    At all times material hereto, each Defendant targeted consumers/purchasers,

including minors like I.C., to (1) purchase and/or play its video games and (2) to purchase in-game items or perks in exchange for real money, known as "microtransactions," through in-game advertising and "fake" avatar friends.

51. Each Defendant—with knowledge of I.C.'s age and Illinois residency—targeted I.C. and induced them to enter into microtransactions.

52. Upon information and belief, there may be individuals, corporations, or entities as yet unidentified to Plaintiffs who were engaged in the research, development, manufacture, design, testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions---and who introduced such products into interstate commerce or marketed such products with knowledge and intent that such products be sold in the State of Illinois---and who also may be liable for some or all of Plaintiffs' injuries and damages as described herein. Despite reasonable and diligent inquiries by Plaintiffs, the identity of said tortfeasor(s) has not been determined as of this date and, therefore, these potential tortfeasors cannot be identified as Respondents in discovery as permitted by 735 ILCS § 5/2-402 and it is necessary to conduct discovery on Defendants in order to determine the identity of said tortfeasor(s). If a such a "John Doe" tortfeasor is identified for one or more causes of action, Plaintiffs will amend this Complaint in accordance with Illinois law.

### III.    JURISDICTION AND VENUE

53. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of the *Complaint*.

54. This *Complaint* brings forth claims for relief arising under the laws of the State of Illinois, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce. Plaintiffs have suffered and

continue to suffer both injuries and damages, as described herein, within the State of Illinois that exceed the sum or value of $75,000, exclusive of interest and costs.

55.    This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

56.    This Court has personal jurisdiction over each Defendant because each routinely conducts business in Illinois and has sufficient minimum contacts in Illinois to have intentionally availed itself to this jurisdiction by marketing video games and transacting business in the State of Illinois.

57.    At all relevant times, each Defendant was present and transacted, solicited and conducted business in the State of Illinois through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

58.    Defendants are conclusively presumed to have been doing business in this State and are subject to Illinois's long arm jurisdiction.

59.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Illinois and throughout the United States.

60.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

### IV.    <u>GENERAL ALLEGATIONS</u>

**A.  The Rise of Video Games**

61.    A "game" is a closed, formal system that engages players in structured conflict and

resolves its uncertainty in unequal outcome. Games are closed in the fact that once engaged in the game, the player sets aside their rules for daily life and accepts the rules of the game as the status quo.

62.     A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

63.     Unlike traditional games of chance, video games require active, lengthy participation, during which players are exposed to the psychological techniques designed to manipulate and exploit this vulnerable population.

64.     Such manipulation and exploitation is possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board ("ESRB").

65.     The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

66.     The industry is yet young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality platforms.

67.     Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time—a long and slow method of earning profits.

68.     A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

11

69. Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games ("RPGs") that can take hundreds of hours to beat, there is a staggering amount of content in modern games.

70. The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

71. The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

72. In 2023, the video game industry's revenue was $365.6 billion globally.

73. With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases. Most of these purchases have been made by minors, like I.C.

74. The explosive growth of the video game industry has been fueled by patented "monetization schemes" that target minors who are induced to make several in-game purchases, or "microtransactions," of downloadable content.

75. Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the appropriateness of games.

76. In order to entice minors to make such in-game purchases, video game developers and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money in microtransactions.

**B. Microtransactions**

77. Instances where players are able to spend real money for in-game items or perks

12

are known as "microtransactions" (sometimes abbreviated "mtx").

78.     The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly in order to meaningfully advance the game.

79.     Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

80.     Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

81.     Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

82.     While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

83.     Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

84.     In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

85.     Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

86.     Developers and publishers can also use microtransactions to lock potentially significant content behind paywalls.

87. Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

88. The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

89. This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

90. This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

91. Microtransactions were designed to use operant conditioning to ensure the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

92. For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking drive players to make microtransaction purchases.

93. Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

94. Microtransactions are not only benefiting the gaming industry publishers and developers; the platforms that allow the microtransactions take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through

their platforms.

95.     While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

96.     Each Defendant knows this, or should be aware of this, because they have purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

## C.  The Monetization Schemes Built into Video Games

97.     Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

98.     The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

99.     Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

100.    Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

        a.  The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

        b.  "Chasing": encouraging players to keep playing to get back any money they just lost;

  c. "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

  d. "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

  e. "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; or

  f. The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

101. The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

102. Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

103. Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game purchasing.

104. Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game. This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize

the likelihood of eliciting player spending.

105.   Games linked to players' social network pages also gather information from these pages in order to personalize content to players' unique interests and preferences.

106.   As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.,* spending or playing longer).

107.   The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm takes into account the player's available funds and cost sensitivity to certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

108.   As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

109.   Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals and which lack basic transparency to the player, may have the potential to exploit certain types of vulnerable players under certain conditions.

110.   These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

111.   A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, pay-to-win models, and rubber-banding.

### i. Loot Boxes

112.    A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

113.    Through purchasing a loot box, the player acquires a seemingly random assortment of items.

114.    The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

115.    Loot boxes require no player skill and have a randomly determined outcome (*i.e.,* prize).

116.    Loot prizes are essentially a lottery—a way for gaming developers, publishers, and even game platforms to increase revenue through underage gambling.

117.    It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

118.    After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

119.    Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

120.    Loot boxes are also ultimately controlled by the gaming developers and publishers,

18

meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

121.    Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

**ii. Rubber-Banding**

122.    Another example of a monetization scheme is "rubber-banding."

123.    Games have long employed rubber-banding to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

124.    Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

125.    In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

126.    If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

127.    Such technical sophistication in these purchasing systems aim to reduce the player's uncertainty or reluctance regarding purchasing decisions.

**iii. Pay-To-Win**

128.    Some games operate on a "pay-to-win" model, a type of predatory monetization

scheme that incentives players who pay more.

129.    Essentially, Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

130.    For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by ordinary, non-paying players.

131.    Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

**D.  Patents Target Minors to Increase In-Game Spending**

132.    Several video game developers and publishers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

133.    Game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

134.    Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

      a.  U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character."  Such an offer is referred to by Luchene as an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

      b.  U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing Inc.,

similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

c.   U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (e.g., of interest to) a first player," then locates "a second user that has acquired (e.g., purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d.   U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e.   U.S. Patent No. 9,138,639 B1, assigned to Kabam Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

21

f.  U.S. Patent No. 8,702,523 B2, assigned to Microsoft Technology Licensing LLC, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into the game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time."

g.  U.S. Patent No. 9,795,886 B1, assigned to EA, allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h.  U.S. Patent No. 10,252,170 B2, assigned to Hasbro Inc., encourages players to make purchases outside of a game to receive in-game benefits. Players can earn in-game points for scanning codes that come with separately purchased physical toys.

i.  U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played

concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.   U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached."  For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k.   U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play."  In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l.   U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to

the users.

m. U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n. U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o. U.S. Patent App. No. 2016/0346677 A1, assigned to EA, but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p. U.S. Patent App. No. 2016/0346677 A1, for which Sony Interactive Entertainment LLC has applied and which is currently pending, seeks to patent technology that would suggest microtransactions to players who are stuck in the game. This patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or

24

otherwise would be useful to the player to complete their objective.

135.    There was once a time when such lopsided consumer video game monetization-related invention would have been patent ineligible. However, because of the introduction of these patents, game developers and publishers are able to further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

136.    The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

137.    It is common practice for developers and publishers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

### E.  These Predatory Monetization Schemes Attract "Whales" to Defendants' Games

138.    What players, like I.C., often do not understand is that their gaming experience is not accidental, but rather, carefully engineered by the game's manufacturers.

139.    In every game, there are several hundred, or maybe even thousands, of heavy players who spend much more money in the game than the other players.

140.     Companies employ tactics specifically to gain heavy users—or "whales" or "VIPs."—and to induce them into spending more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

141.    Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

142.    To target those who may be likely to spend additional money in the game, game

developers and publishers, like Defendants, will monitor players and collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

143.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

### F.  Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted

144.    In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, feedback loops, continuously adding new game content, and using tactics to ensure users are creating habits in their gameplay.

145.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

146.    For instance, Activision in particular holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[2]

147.    Upon information and belief, Activision works in concert with the other Defendants to license this patented technology and allow all Defendants to control users' experiences within the game.

148.    Defendants are also utilizing several psychological tools to increase game play

---

[2] *See* Patents assigned to Activision publishing, JUSITIA,
https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

time, such as the use of feedback loops.

149.    Feedback loops are systems where the game reacts to how well the player is doing in order to make the games more rewarding, or for tougher games, more challenging.

150.    Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

151.    There are two kinds of feedback loops: positive and negative.

152.    Positive feedback loops mean that when you're doing well, the game rewards you with things to help you do even better.

153.    Negative feedback loops, on the other hand, add a challenge to a game when you are doing too well.

154.    Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

155.    By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

156.    A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed by the use of negative feedback loops.

157.    When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

158.    In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players playing longer.

27

159.    Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

160.    Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

161.    Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

162.    Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

163.    By constantly adding downloadable content, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the content and the game.

**G.  Dark Patterns and Drip Pricing Have Allowed Defendants to Further Exploit Users**

164.    For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find-and-read disclosures, and confusing cancellation policies, to get consumers to part with their money or data.

165.    The term "dark patterns" was coined in 2010 by user design specialist Harry Brignull to describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm---and that they would or may not have otherwise made.

166.    The purpose behind "dark patterns" is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions.

167.    Research shows that "dark patterns" are highly effective at influencing consumer behavior.

168.    The use of these manipulative design practices, or "dark patterns," has only grown in scale and sophistication as more and more commerce has moved online, thereby creating ever greater challenges for consumers.

169.    Further challenging consumers is the common practice of using multiple "dark patterns" in combination, rather than in isolation.

170.    "Dark patterns" tend to have even stronger effects when they are combined, so they are rarely used in isolation.

171.    "Dark patterns" have a compounding effect, thereby increasing the impact of each and exacerbating the harm to the consumer.

172.    The use of manipulative design techniques, including "dark patterns," in the digital world can pose heightened risks to consumers. For example, the pervasive nature of data collection techniques allows companies to gather massive amounts of information about consumers' identities and online behavior, enabling businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.

173.    Companies that market online can experiment with digital dark patterns more easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior.  For example, online a company can easily and quickly rearrange products to mimic the consumers' behaviors,

but also can easily test new marketing practices and digital dark patterns on consumers, deceiving consumers or manipulating them into taking unwitting or detrimental actions.

174. Some "dark patterns" manipulate consumer choice by inducing false beliefs, such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level.

175. Other "dark patterns" operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

176. Free-to-play or "freemium" games are an example of games that fail to disclose to a minor that a game they purchase is not the entire game.

177. Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process.

178. Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction.

179. Microtransactions built into many video games by design are a form of drip-pricing.

180. Each Defendant uses, or has used at relevant times, "dark patterns" in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of their respective gaming products.

**H. Cloud Gaming Enhances Defendants' Predatory Activities**

181. Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

182. Cloud gaming, or gaming on demand, is a type of online gaming that runs video

games on remote servers and streams them directly to a user's device.

183.    Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

184.    Cloud gaming platforms allow users to stream any game available on the platform at any time.

185.    Cloud gaming eliminates the need for users to purchase expensive computer hardware or install games directly onto a local game system.

186.    This means players have easy access to hundreds or even thousands of games at one time.

187.    What's more, the catalogue of games on streaming platforms is ever-changing and evolving.

188.    The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming platform, by ensuring they always have something new and different to play.

**I.    Defendants' Predatory Schemes Created a Generation of Gaming Addicts**

189.    The feedback loops, other psychological properties, and cloud gaming platforms are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, platforms, and predatory monetization schemes work together to addict players to the games.

190.     During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[3]

191.     The very nature of action-entertainment games not only attracts young people with focus, attention, and anger issues (particularly in the case of violent video games), but it also tends to reinforce these negative behaviors.

192.     In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[4]

193.      Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, an occupational responsibilities.

194.     IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

195.     Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

---

[3] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis*. 46(3) Applied Psychophysiology and Biofeedback 301 (2021).
[4] *Id.*

196.    IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative consequences.

197.    The main features of gaming disorder are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

198.    The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

199.    Gaming disorder is the only behavioral addiction recognized in the DSM-5.

200.    The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

201.    Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

202.    The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

203.    For instance, IGD may be an impulse control disorder, similar to compulsive gambling.

204.    The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in

previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

205.    These nine criteria are also outlined in the DSM-5.

206.    Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

207.    The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

208.    The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

209.    The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

210.    The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

211.    Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

212.    The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

213.    Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic

review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

214.    These statistics are even higher for minors: 8.5% of youths aged between 8 and 18 suffer from gaming disorder.

215.    Moreover, comorbidity studies also indicate that individuals with ADHD may have an increased susceptibility to developing gaming disorder.

**J.  Effects of Video Games on Adolescent Brains**

216.    Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

217.    Moreover, clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

218.    In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the U.S.

219.    Furthermore, empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

220.    Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

221.    Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

222.    The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

223.    The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

224.    This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

225.    Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[5]

---

[5] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

226.    Similarly, brain activation studies have shown that videogame playing involved changes in reward and loss of control, and that gaming pictures activate regions similar to those activated by cue-exposure to drugs.

227.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure.



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[6]

228.    Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

229.    One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

230.    Videogame play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

231.    These increased dopamine releases in the brain can lead to withdrawal symptoms,

---

[6] *Id.*

including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

232.    As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

233.    As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

234.    By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiffs seek to hold them accountable.

**K.  I.C.'s Addiction, Injuries, and Damages**

235.    I.C. is a 14-year-old individual addicted to video games; specifically, Fortnite, Roblox, and Minecraft.

236.    I.C. spends approximately 2-3 hours per weekday playing these games, and over 35 hours a week total.

237.    I.C. cannot control their gameplay or spending in the game.

238.    I.C. has been diagnosed with ADHD and Depression. They also has experienced the following as a result of gaming addiction: diminished social interactions, a lack of interest in other sports/hobbies, a loss of friends at school, changes in eating patterns, poor hygiene, and withdrawal symptoms such as rage, anger, and physical outbursts.

239.    As a result, I.C. has undergone out-patient counseling, medication therapy, and has

an IEP at school.

240.    I.C. has spent hundreds of dollars on in-game transactions and downloadable content. These funds do not include the costs spent on gaming consoles, and copies of games.

241.    As a result of each Defendant's intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, as described herein, Cynthia Jimenez has experienced emotional distress, mental anguish, pain, suffering, and has been financially damaged due to I.C.'s uncontrollable in-game spending resulting from I.C.'s gaming addiction and is reasonably likely to continue to experience injuries in the future due to the permanent physical and emotional impact of Defendant's wrongs on Plaintiffs.

**L.  Defendants' Conduct Specifically Led to Plaintiffs' Damages**

242.    Each Defendant is aware that its video games are harmful to minors and young adults because Defendants specifically designed their games to addict.

243.    To this avail, each Defendant employs behavioral psychologists and/or neuroscientists in order to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

244.    Due to the psychological aspects of the games, many of Defendant's products have been banned in other countries to avoid the harm to children Defendants are causing daily in the United States.

245.    No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including Plaintiffs.

**L. Defendants' Products**

**Fortnite**

246.    Fortnite, developed and published by Epic Games, was first released in 2017 and is

now available in three distinct game mode versions that otherwise share the same general gameplay and game engine.

247.    Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 players fight to be the last person standing. Players can play alone, in a duo, or in a "squad" of 3-4 players. When players land in the game, they must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other players.

248.    Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four players fight off zombie-like creatures and defend objects with traps and fortifications they can build. From missions, players are awarded a number of in-game items, which include hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes.

249.    Fortnite Creative is a sandbox game mode in which players are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

250.    Each game mode has similar graphics, art assets, and game mechanics.

251.    Battle Royale and Save the World are rated T for Teen—*i.e.,* recommended for individuals aged 13 and above. However, this does not mean younger children are not playing the game.

252.    Epic Games is currently working with the International Age Rating Commission ("IARC") to rate all islands and other content published through Creative mode.

253.    Save the World is the only pay-to-play game mode of the Fortnite franchise.

254.    And while Fortnite can be played through Microsoft's Xbox Cloud Gaming, no subscription to Microsoft's Xbox Game Pass is required to play Fortnite. The games are free

through the Xbox Cloud Gaming service:



YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS. [7]

255.    Fortnite is also available for free on multiple other platforms, including Epic Games, Steam, and PlayStation.

256.    Fortnite games are monetized through the use of V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

257.    V-Bucks in Save the World can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

258.    V-Bucks in Battle Royale can be used to buy cosmetic items like character models or the game's battle pass: a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a Battle Royale season.

259.    Fortnite has an average of 239 million monthly players and a peak of 15 million players in a day.

260.    Less than two years after Fortnite's release in 2017, the games had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue.

---

[7] https://www.fortnite.com/mobile/xbox-cloud-gaming

261. The addictive properties of Fortnite are so dangerous on young minds that several health and behavioral centers across the country have published resources for parents specifically warning about Fortnite addiction.

262. Several studies have concluded that Fortnite is "more addictive than heroin and other illegal drugs."

263. Despite these third-party express warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into its game.

264. Fortnite gained immense popularity because of its clever manipulation of human psychology. Epic Games developed Fortnite games to make sure that the players keep coming back and playing Fortnite.

265. The team that developed Fortnite included psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a game that was as addictive as possible.

266. One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what stopped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

267. The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds.

268.    On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

269.    In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

270.    Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule"—the idea that randomized small wins will continue to draw in users.

271.    With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

272.     Additionally, the design of Fortnite keeps players drawn in. The bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

273.    Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more. In designing such mechanics, Epic Games ensures that players never once get bored while playing.

274.    To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well.

275.    Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:



276.    Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

277.    These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

278.    Upon information and belief, Epic Games has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

279.    Epic Games does not disclose any of the psychological tactics or addictive features it purposefully includes in Fortnite to any of its users.

280.    Epic Games touts its game as "educational" and markets it for use in the classroom.

---

[8] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

281. On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



282. Engaging—and addicting—children early and in environments such as their classroom serves only to increase Epic Games's revenue through continued play of young users, at the expense of these users' mental and physical health.

283. Epic Games does not adequately inform users of the inherent risks involved with using and playing Fortnite or that the game was designed to addict and harm users.

**Roblox**

284. Roblox, developed and published by Roblox Corp., is an online "social gaming platform" and game creation system that allows users to program games and play games created by other users.

285. Roblox was first released in 2006 but began to grow rapidly after 2015. This growth was accelerated by the Covid-19 pandemic.

286. Roblox is free to play but offers in-game purchases available through a virtual

---

[9] https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

currency called Robux.

287.    Through Robux sales, Roblox generated $2.2 billion in revenue in 2022, a 16% increase from 2021; in 2021, Roblox increased its revenues by 107% of its 2020 revenues, which were themselves an 111% increase over 2019.

288.    Roblox currently has over 66 million daily active users and over 217 million monthly active users.

289.    Over half of Roblox users are under age 13.

290.    Roblox's goal is to "connect[] a billion people" with its game:



291.    To reach this goal, Roblox Corp. ensures that Roblox is easily accessible for users. It is currently available on nearly any device, including gaming consoles, computers, and mobile devices:



---

[10] https://corp.roblox.com/
[11] https://corp.roblox.com/

292.    Roblox Corp. describes its game as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's imagination can thrive."[12]

293.    Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:



294.    Roblox contains numerous addictive principles that are negatively impacting minors' and young adults' livelihoods, including their ability to learn and engage in critical thinking.

295.    While video games can foster creativity in children through their abundance of creative tasks, such benefits are outweighed by the negative aspects of addiction, which children develop quickly.

296.    Such is the case with Roblox, which was specifically designed with certain addictive properties—at the risk of children's mental and physical health.

297.    Roblox Corp. hires psychologists and scientists to work with software engineers and game developers to ensure that their game includes the best psychological traits for player retention and addiction.

---

[12] https://corporate.roblox.com/faq/
[13] https://education.roblox.com/

298.   In Roblox, players can create games and maps for other users to try and play, making it a challenge in and of its own.

299.   When playing games and completing challenges like this, a user's brain releases dopamine: the neurotransmitter in the brain that enables an individual to feel happiness and pleasure

300.   The dopamine increases that come with beating challenges and other players addicts users quickly, especially those who enjoy achievement and competition.

301.   Additionally, the variety within Roblox ensures that users are never bored and want to stop playing the game; there are always new challenges, maps, and characters to try, making the game feel like an ever-evolving entity that never stops providing entertainment.

302.   There is also a social aspect to Roblox that allows users to interact with friends or other users within the game.

303.   The intentionally-social nature of the game pressures users to spend more money as their friends do.

304.   Roblox makes in-game spending as easy as possible.

305.   Minors and young adults can quickly spend large sums of money inside the game, often using their parents credit cards.

306.   The ability for users to create their own games and challenges, combined with users' ability to spend real-world funds to change their avatar's image and abilities, makes sure that the gaming experience is different for players each time they log in.

307.   Such constant variety keeps players "hooked," or coming back daily and playing for hours.

308.   Though it is equipped with the knowledge of the addictive risks inherent in its

48

game, Roblox Corp. has failed to inform the public, users, or parents of such risks.

309.     Roblox Corp. knows that many users—like I.C.—play in excess, but rather than discourage such play, Roblox Corp. profits off their continued game time and Robux spending.

310.     Roblox Corp. markets its game as an educational tool and beneficial to children, all while concealing the true psychology behind its design.

311.     Roblox Corp. do not adequately inform users of the inherent risks involved with using and playing Roblox or that the game was designed to addict and harm users

**Minecraft**

312.     Minecraft is a "sandbox game" in which players explore a blocky, procedurally generated, three-dimensional world with virtually infinite terrain.

313.     "Sandbox games" are those that do not constrain a player to achieving specific goals, and instead permit users a large degree of freedom to explore, interact with, or modify the game environment.

314.     Minecraft was developed by Mojang Studios and is published by Mojang Studios for Nintendo Switch and Android devices.

315.     Microsoft acquired Mojang Studios and the Minecraft intellectual property in 2014.

316.     Minecraft can be played on PC, various gaming consoles, and mobile devices.

317.     Minecraft has over 163 million monthly active players.

318.     Minecraft's revenue in 2021 was $380 million, from all different gaming platforms combined.

319.     In Minecraft, players can discover and extract raw materials, craft tools and items, and build structures and machines.

320.     Minecraft includes multiple game modes that include a survival mode, in which

players must acquire resources to build in the world and maintain health, and a creative mode, in which players have unlimited resources and access to flight.

321.    Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world.

322.    The game world is virtually infinite and procedurally generated as players explore it.

323.    Accordingly, the game can be different each and every time a player logs in to play.

324.    When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard."

325.    Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play.

326.    Each player's main task in Minecraft is to survive all the problems using specific resources.

327.    When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling.

328.    Players with ADHD, especially, can become easily hyper focused and addicted to building worlds within the game.

329.    Minecraft multiplayer options also work to addict players to connecting with others in the Minecraft world.

330.    These versions also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

331.    On certain devices, Minecraft pushes constant notifications about new features,

skins for avatars, and new objects in the games.  These notifications pop up on screen whether players are already playing Minecraft or not.

332.    These interactive features serve only to lure players to spend more time in the game.

333.    Once a player succeeds with one stage, they move on to the next one.  Essentially, Minecraft can last for eternity if the player is not strong-willed enough to stop playing.

334.    Mojang Studios was aware of and specifically developed their games along with psychologists and neuroscientists to include such addictive psychological traits.

335.    Mojang Studios is aware that the more time a user plays the game, the more likely they are to continue purchasing in-game content.

336.    Thus, at the expense of users' mental and physical well-being, Mojang Studios fails to inform the public, users, or parents about the risk of addiction and other negative consequences that can arise from gameplay.

337.    Instead, Mojang Studios tout the game as educational and market it to educators for use in the classroom:

## GET MINECRAFT EDUCATION FOR YOUR CLASSROOM

Engage students in game-based learning across the curriculum. Minecraft Education is a game-based platform that inspires creative, inclusive learning through play. Explore blocky words that unlock new ways to take on any subject or challenge. **Download Minecraft Education** to get started with a free demo.

[14]

---

[14] https://education.minecraft.net/en-us

338.    Mojang Studios even offers teachers ready-built lessons and curriculums centered around their game:



<sup>15</sup>

339.    Mojang Studios intends to introduce and addict as many users as possible in order to increase their own profits as these users continue playing—and spending—as they grow.

340.    Mojang Studios does not adequately inform users of the inherent risks involved with using and playing Minecraft or that the game was designed to addict and harm users.

**<u>Nintendo eShop</u>**

341.    Nintendo is the manufacturer for the gaming console the Nintendo Switch.

342.    Through the Switch, Nintendo provides a platform for users to download certain games and play them on the Switch device.

343.    This platform is called the "Nintendo eShop."

344.    Both Fortnite and Minecraft are available through the Nintendo eShop.

---

<sup>15</sup> https://education.minecraft.net/en-us

345.    Once a game is downloaded, Nintendo provides a framework, through the eShop, for in-game purchases to initiate and process transactions:



346.    This framework enables game developers to sell microtransactions and/or loot boxes through the Nintendo platform.

347.    In exchange, Nintendo keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

348.    Nintendo specifically designed this platform to attract users to purchase games and in-game content therein—regardless of the harmful content such games may include.

349.    Upon information and belief, Nintendo hires behavioral psychologists and neuroscientists to design its consoles, games, platform, and marketing in the best way possible to attract users, especially minors and young adults.

350.    Nintendo is aware that several of the games on its platform that it sells and encourages users to purchase continuous in-game content are addictive and pose unreasonable risk

---

[16]https://www.nintendo.com/us/search/#q=minecraft&p=1&cat=gme&sort=df&f=topLevelFilters&topLevelFilters=DLC

of harm to users, particularly minors.

351.    Nintendo does not adequately inform users of the inherent risks involved with using its platforms or that the platforms—along with the games being played thereon—were designed to addict and harm users.

**Google Play App**

352.    Through the Google Play app, Google provides a platform for users to download certain games and play them on Android mobile devices.

353.    Both Roblox and Minecraft are available in the Google Play App.

354.    Once a gaming app is downloaded, Google provides a framework for "in-app billing" to initiate and process transactions.

355.    This framework enables game developers to sell microtransactions and/or loot boxes through the Google platform.

356.    Google takes 30% of all revenue generated by these microtransactions and in-app purchases per its agreements with game developers, including other Defendants.

357.    Google does not adequately inform users of the inherent risks involved with using its platforms or that the platforms—along with the games being played thereon—were designed to addict and harm users.

358.    Google specifically designed this platform to attract users to purchase games and in-game content therein—regardless of the harmful content such games may include.

359.    Google hires behavioral psychologists and neuroscientists to design its consoles, games, platform, and marketing in the best way possible to attract users, especially minors and young adults.

360.    Google is aware that several of the games on its platform that it sells and encourages

users to purchase continuous in-game content are addictive and pose unreasonable risk of harm to users, particularly minors.

## Microsoft Xbox 360 and Xbox Live

361.    Microsoft is the manufacturer of the Xbox gaming consoles.

362.    Microsoft's promotions for Xbox products depict children and tweens (children 11-12 years old) and advertise the use of Xbox Live to access child-oriented content.

363.    Microsoft knows, and at all relevant times has had actual knowledge, that it collects and maintains personal information from children.

364.    From January 2017 through December 2021 alone, approximately 218,000 users in the United States entered full birthdates indicating that they were children younger than 13 years old when creating Microsoft accounts through an Xbox Console.

### M. I.C.'s Access to Defendants' Products

365.    I.C.—as a minor—lacked the capacity to contract, and thus expressly disaffirms any contract they may have made with any of the Defendants, or that Defendants may claim they made with them before reaching the age of majority.

366.    I.C.'s continued use of Defendants' products was thereafter compulsive and due to addiction and in no way was an affirmation of any contract.

367.    Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiffs agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

368.    Defendants' products were designed to addict I.C. to the products, which caused a slew of mental and physical health issues to I.C. Defendants' terms and conditions and any other

purported contracts are therefore void as against public policy as an individual cannot consent to harming a child.

## V.    TOLLING OF STATUTE OF LIMITATIONS

369.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

370.     Through the exercise of reasonable diligence, Plaintiffs could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

371.    Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year.

372.    Due to the highly technical nature of the Defendants' products, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until within the last year.

373.    Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

374.    Defendants' fraudulent concealment has tolled the running of any statute of limitations.

375.    Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

376.    Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

377.    Defendants' tortious and fraudulent acts continue to this day; as of the date of this

*Complaint*, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

378.    Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

379.    I.C. was unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

380.    Cynthia Jimenez and I.C. were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

381.    For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.    CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT
### (Against all Defendants)

382.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

383.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch and Google Play.

384.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

385.    Each of the Defendant's respective products are marketed and advertised to minors and young adults.

386.    Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products. More specifically:

  a.  Epic Games designed Fortnite to be as addictive as possible and includes numerous psychological tricks to ensnare users, including but not limited to a "near miss" effect, random rewards, bright and vibrate colors, and continual gameplay variety;

  a.  Roblox Corp. designed Roblox with addictive properties including but not limited to constant variety, social aspects, and numerous characters, skins and other content available for purchase;

  b.  Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, including but not limited to a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

  c.  Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and to pushed users to make purchases of addictive materials on the platform; and

58

d. Google designed the Google Play app as a platform to house addictive gaming products and to push users to make purchases of addictive materials on the platform.

387. The defects in the design of each of the Defendant's respective products existed prior to the release of these products to I.C. and the public, and there was no substantial change to any of the Defendants' products between the time of their manufacture (in regards to consoles or physical game copies) and the time of their distribution to I.C. via download or URL access (in regards to digital game copies and cloud gaming).

388. I.C. used these products as intended, and each Defendant knew or, by the exercise of reasonable care, should have known that Plaintiff would use these products without inspection for their addictive nature.

389. Each Defendant defectively designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

a. Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users, while knowing that abuse, addiction, and compulsive use by youth can lead to injury;

b. Roblox Corporation designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

c. Mojang Studios and Microsoft designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the

addiction of minor users;

d.   Nintendo designed the Nintendo eShop in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content; and

e.   Google designed the Google Play app in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content.

390.   Each of the Defendant's respective products are defective in design and unreasonably dangerous for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

391.   Youth, like I.C., and young adults are among the ordinary consumers of each of the Defendant's products. Pre-teen and young consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable content and/or microtransactions.

392.   Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive

use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

393. Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including I.C., who used the products without any substantial change in the products' condition.

394. The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

395. Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

    a. Choosing not to use "addictive" patents identified herein in the game design;

    b. Redesigning gaming software to limit rather than promote addictive engagement;

    c. Implementing robust age verification;

    d. Implementing effective parental controls;

    e. Implementing effective parental notifications;

    f. Warning of health effects of use and extended use upon sign-up or log-in;

    g. Implementing default protective limits to the length and frequency of gaming sessions;

    h. Implementing opt-in restrictions to the length and frequency of gaming sessions;

    i.   Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

    j.   Implementing blocks to use during certain times of day (such as during school hours or late at night);

    k.   Implementing limits on number of games playable per day;

    l.   Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

    m.   Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

    n.   Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

    o.   Others as set forth herein.

396.    Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

397.    I.C. used Defendants' products as intended or in reasonably foreseeable ways.

398.    As a direct and proximate result of their use of Defendants' defectively designed products, I.C. sustained physical injuries, mental harm, emotional distress, pain and suffering, mental anguish, and economic injuries and damages.

399.    I.C.'s injuries and damages were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion,

and distribution, especially considering each of the Defendant's conduct—described herein—of specifically designing their respective products to be addictive.

400.    The defective design of the products used by I.C. was a substantial factor in causing harm to I.C.

401.    As a direct and proximate result of Defendants' respective products' defective design, I.C. suffered serious injuries, including physical injury, mental health diagnoses, diminished social interactions, depression, a lack of interest in other sports/hobbies, a loss and/or lack of friends at school, and withdrawal symptoms such as rage, anger, and physical outbursts.

402.    I.C. was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and Plaintiffs suffered economic damages as a result thereof.

403.    The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to I.C. Plaintiffs' damages proximately caused by Defendants' defective design are I.C.'s mental harm (and the permanency thereof); pain and suffering; mental anguish; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical  care, treatment, and service (including transportation, lodging, and board) expenses related to I.C.'s injuries. I.C.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

404.    Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

405.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such

remedies at law are inadequate.

406. The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, I.C. continues to use Defendants' respective products. While I.C. uses Defendants' respective products, they will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

407. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN
### (Against All Defendants)

408. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

409. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

410. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

64

411.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

412.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

413.    Each of the Defendants sold and distributed its respective products to I.C. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

414.    Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

415.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution and their respective propensities for abuse, addiction, and compulsive use by youth which can lead to a cascade of harms.

416.    Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

    a.   Defendants' respective products cause addiction, compulsive use, and/or other

65

simultaneous physical and mental injuries;

b. Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

c. The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming content to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

d. New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e. The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f. The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

417. Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

418. Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiffs would have heeded the warnings and/or

instructions.

419. Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

420. As a direct and proximate result of each Defendant's failure to warn, I.C. has required and will require more healthcare and services and did incur medical, health, incidental, mental disability and related expenses, as described herein.

421. Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

422. The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

423. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, I.C. continues to use Defendants' respective products. When I.C. uses Defendants' respective products, they will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

424. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive

damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## STRICT LIABILITY – FAILURE TO INSTRUCT
### (Pleaded in the Alternative)
### (Against All Defendants)

425. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

426. Plaintiffs plead this claim in the alternative.

427. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

428. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

429. Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

430. Each of the Defendants sold and distributed its respective products to I.C. in a defective and unreasonably dangerous condition by failing to provide reasonable and adequate instructions with respect to the conditions and methods of the product's safe use when a risk of abuse, addiction, and compulsive use by youth was reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by them.

431. Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

68

432.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

a.    Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.    Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.    Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.    Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e.    Google designed the Google Play app as a platform to house addictive gaming

products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

433. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to I.C.

434. Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

435. Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to instruct users with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harms built into each Defendant's respective products.

436. Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

437. A reasonable company under the same or similar circumstances as Defendants

would have used provided adequate instructions to consumers, including minor users and parents like Plaintiffs.

438.    At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

439.    Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, I.C. and their parents would have followed such instructions.

440.    Each Defendant's failure to adequately instruct Plaintiffs regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

441.    As a direct and proximate result of each Defendant's failure to instruct, I.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

442.    Defendants are strictly liable due to each Defendant's failure to regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, as described herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

443.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

444.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, I.C. continues to use Defendants' respective products. When I.C. uses Defendants' respective products,

they will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

445.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT IV
## NEGLIGENCE – DESIGN
### (Against All Defendants)

446.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

447.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

448.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

449.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

450.    Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner. More specifically:

72

a. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e. Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social

73

isolation, negative consequences on cognitive processes, and other harmful effects.

451.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to I.C., especially considering each of the Defendant's conduct—described herein—of specifically designing their respective products to be addictive.

452.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include abuse, addiction, and compulsive use in youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects. Despite this knowledge, each Defendant failed to warn users, like I.C., of their respective product's dangerous propensity.

453.    Each Defendant knew that minors such as Plaintiff I.C. would use its respective products.

454.    I.C. was a foreseeable user of the Defendants' respective products.

455.    Each Defendant had a non-delegable duty to design reasonably safe products.

456.    Each Defendant owed this duty to users like I.C.

457.    Each Defendant breached this duty. These breaches include, but are not limited to:

a.   Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

74

b.  Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

c.  Failing to use ordinary care in the design of its products by negligently designing them to push users—including minors like I.C.—to continually purchase addictive content;

d.  Failing to limit minor users' ability to access and purchase addictive content;

e.  Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

f.  Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.  Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

h.  Otherwise failing to use ordinary care in its design.

458.  Alternative designs that would reduce the addictive features of Defendants' respective products were available, would have served effectively the same purpose as each of the

Defendant's defectively designed products, and would have reduced the gravity and severity of danger Defendants' respective products posed minors such as Plaintiff.

459.     A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

460.     At all relevant times, I.C. used Defendants' respective products in the manner in which they were intended by Defendants to be used.

461.     As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs were harmed. Defendants' design of their respective products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

462.     As a direct and proximate result of each of the Defendant's breached duties, I.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses related to the I.C.'s gaming addiction, physical injuries, mental health diagnoses, emotional distress, pain, suffering, and mental anguish proximately caused by the negligent design of each Defendant's product.

463.     As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs have suffered—and continued to suffer—economic loss and pecuniary damages, as described herein, related to the I.C.'s gaming addiction, physical injuries, mental health diagnoses, emotional distress, pain, suffering, and mental anguish proximately caused by the negligent design of each Defendant's product..

464.     Defendants negligently designed their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT V
## NEGLIGENCE – FAILURE TO WARN
### (Against All Defendants)

465.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

466.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

467.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

468.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

469.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner. More specifically,

    a.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    b.  Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation,

negative consequences on cognitive processes, and other harmful effects;

c. Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e. Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

470.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to I.C., especially considering each of the Defendant's conduct—described herein—of specifically designing their respective products to be addictive.

78

471. Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as I.C. would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

472. Each Defendant knew that minors such as I.C. would use its respective products.

473. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

474. Had Plaintiffs received proper or adequate warnings about the risks of Defendants' respective products, Plaintiffs would have heeded such warnings.

475. Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

476. Each Defendant owed this duty to users like I.C.

477. Each Defendant breached this duty owed to I.C., a foreseeable user. These breaches include, but are not limited to:

    a. Failing to warn users that Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries; and

    b. Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product.

478.    A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

479.    At all relevant times, each Defendant could have provided adequate warnings to prevent the harm and injuries described herein.

480.    Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, I.C. and their legal guardian would have heeded such warnings.

481.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing the harm to Plaintiffs.

482.    Each Defendant negligently failed to warn consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VI
## NEGLIGENCE – FAILURE TO INSTRUCT
### (Against All Defendants)
### (Pleaded in the Alternative)

483.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

484.    Plaintiffs plead this Count in the alternative.

485.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

486.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

487.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

488.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

a.    Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.    Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.    Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.   Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e.   Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

489.   Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to I.C.

490.   Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

491.   Each Defendant had a duty to give reasonable and adequate instructions with

respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by them.

492. Each Defendant breached its duty by failing to provide reasonable and adequate instructions to I.C., a foreseeable user. More specifically, Defendants did not give any instructions with respect to the addictive conditions of their respective products or on methods of their safe use to avoid the risks and harms built into each Defendants' respective gaming products...

493. A reasonable company under the same or similar circumstances as Defendants would have used provided adequate instructions to consumers, including minor users and parents like Plaintiffs.

494. At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

495. Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, I.C. and their legal guardian would have followed such instructions.

496. As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate instructions, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient instructions was a substantial factor in causing the harm to Plaintiffs.

497. As a direct and proximate result of each Defendant's failure to instruct, I.C. has required---and will require more---healthcare and services, along with incurring---and continuing to incur---medical, health, incidental, and related expenses.

498. Plaintiffs have also incurred economic losses, in the tune of thousands of dollars spent by I.C. while using Defendants' products that they would not have incurred but for the

addictive and harmful propensities of Defendants' gaming products.

499.    Each Defendant negligently failed to instruct consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VII
## NEGLIGENCE PER SE
### (Against All Defendants)

500.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

501.    The United States Congress has enacted the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, to protect minors who use the Internet.

502.    Federal regulations, specifically 16 C.F.R. § 312 *et seq.*, have been put in place to effectuate COPPA's purposes and which establish certain obligations for operators of websites and online services that are intended to inform parents and guardians about the collection of their children's personal information.

503.    COPPA requires operators of online services and websites directed to children under 13 to notify parents about the personal information they collect and to obtain verifiable parental consent before collecting and using any personal information collected from children. 16 C.F.R. § 312.4(a).

504.    The parental notice required by COPPA "must be clearly and understandably written, complete, and must contain no unrelated, confusing, or contradictory materials." 16 C.F.R. § 312.4(a).

505.    COPPA requires operators to make reasonable efforts to ensure that a parent of a

child receives direct notice of the operator's practices with regard to the collection, use, or disclosure of personal information from children before collecting personal information from children. 16 C.F.R. § 312.4(b).

506.    COPPA requires operators of online services and websites to collect a child's telephone number, as opposed to online contact information, without first obtaining verifiable parental consent. 16 C.F.R. § 312.5(c)(1) and (6).

507.    COPPA requires operators to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Defendant collects personal information from children. 16 C.F.R. § 312.4(d).

508.    A violation of COPPA, including the regulations enacted to enforce that law, constitutes an unfair or deceptive act or practice in or affecting commerce. *See* 15 U.S.C. § 6502(c); 15 U.S.C. § 45(a)(1).

509.    Avatars generated from a child's image, and biometric and health information, are covered by COPPA when collected with other personal data.

510.    Each Defendant is an "operator" as defined by 16 C.F.R. § 312.2 and, therefore, subject to the laws and regulations established by COPPA.

511.    Each of the Defendants collects or uses personal information from children under the age of 13—including I.C.—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

512.    Each Defendant has actual knowledge that it collects personal information directly from users of its respective websites or online services.

513.    Each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

a. Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

b. Failing to make reasonable efforts, taking into account available technology, to ensure parents received such notice on their websites and applications so that parents could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

c. Failing to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

514. Epic Games violated COPPA and those violations include, but are not limited to:

a. Deploying design tricks, known as dark patterns, to dupe millions of players (including minors like I.C.) into making unintentional purchases in its Fortnite game;

b. Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

c. Collecting personal data from children, including I.C., without first obtaining parents' verifiable consent despite being aware that many children were playing Fortnite;

d. Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

e. Utilizing default settings that enable live on-by-default text and voice communications for users and these default settings harm children and teens—and violate COPPA because these default settings, along with Epic Games's role in matching children and teens with strangers to play Fortnite together, harmed children and teens, exposing children and teens to bullying, threats, harassment, and other dangerous and psychologically traumatizing issues such as suicide while on Fortnite;

f. Tricking users, including minors like I.C., into making purchases while playing Fortnite. More specifically, the company has deployed a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases. Fortnite's counterintuitive, inconsistent, and confusing button configuration led players to incur unwanted charges based on the press of a single button. For example, players could be charged while attempting to wake the game from sleep mode, while the game was in a loading screen, or by pressing an adjacent button while attempting simply to preview an item. These tactics led to hundreds of millions of dollars in unauthorized charges for consumers;

g. Charging account holders, including Cynthia Jimenez, without authorization and allowed minors, including I.C., to purchase in-game content without parental consent;

h. Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the content they have purchased, which can total thousands of dollars and, even when Epic agreed to unlock an account, consumers were warned that they could be banned for life

87

if they disputed any future charges; and

i.    Purposefully obscuring cancel and refund features to make them more difficult to find.

515.    Epic Games's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

516.    Roblox Corp. violated COPPA and those violations include, but are not limited to:

a.    Using a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face in order to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—in order to track the user and their gaming patterns;

b.    Allowing advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising on a daily basis;

c.    Failing to adequately disclose to children when advertising is present withing experiences and videos on Roblox; and

d.    Failing to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

517.    Roblox Corp.'s COPPA violations harmed and damaged Plaintiffs because, *inter*

*alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

518.    Mojang Studios and Microsoft, in connection with Minecraft, violated COPPA and those violations include, but are not limited to:

  a.    Collecting and maintaining personal information from minors without parental consent. For example, when learned that certain users were children after they provided their birthdates in the first step of the account creation process but went on to request phone numbers from the children, before seeking to involve a parent;

  b.    Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

  c.    Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

    i.    Collecting personal information, from the child in violation of COPPA and then suggesting that the child seek parental involvement—this limited notice of Mojang Studios and Microsoft's information practices failed to ensure parents received adequate notice about Defendants' collection, use, and disclosure practices concerning children's personal information;

    ii.    Failing to include the information required by 16 C.F.R. § 312.4(b);

    iii.    Failing in the direct notice to describe Defendants' collection and use

practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement"); and

    iv. Not disclosing in the direct notice to parents that Defendant intended to collect such personal information as images that could contain a child's likeness;

d. Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Defendants collect personal information from children;

e. Failing to include a complete Privacy Statement was incomplete. More specifically, until at least 2019, Defendants' Privacy Statement contained a section entitled "Collection of data from children"; however, this section did not describe what personal information was collected from children or Defendants' use and disclosure practices for personal information collected from children as required---and instead the section discussed Microsoft's information practices regarding Microsoft products and children generically.

519. Mojang Studios and Microsoft's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

520. Microsoft violated COPPA and those violations include, but are not limited to:

a. Collecting personal information from children who signed up to its Xbox

gaming system without notifying their parents or obtaining their parents' consent, and by illegally retaining children's personal information;

b. Allowing children, after creating an account on XBox, to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user. Microsoft then combines this information with a unique persistent identifier it creates for each account holder, even children, and could share this information with third-party game and app developers. Microsoft allowed—by default—all users, including children to play third-party games and apps while using Xbox Live, requiring parents to take additional steps to opt out if they don't want their children to access them;

c. Using the data collected on minor children less than 13 years old to use a patented system of analyzing gamer behavior, tracking kids with their respective gamer tag, and used a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or internet gaming disorder;

521. Microsoft's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

522. Google violated COPPA and those violations include, but are not limited to:

a. Employing dark patterns in children's gaming apps, including Roblox and Minecraft. These dark patterns include, but are not limited to, tricking someone

91

into paying for goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges;

b. Deploying in children's gaming apps indistinguishable or similar buttons to "advance" for free in a game and "purchase" products. For example: the green button is the button they click to advance from one level to the next level, but suddenly making that button a "Buy" button. Most children will be caught, because they are used to clicking the "green" button, and suddenly it completes a purchase;

c. Using dark patterns to entice minors, including I.C., into microtransactions without parental consent or consent of the account holder. More specifically, once the account holder downloaded the app and children began playing the game, unbeknownst to the account holder, kids could simply rack up multiple charges, ranging from $0.99 to $99.99 each, by tapping buttons, with no account holder involvement. These purchases were often disguised as play money. A child may be prompted to use or acquire seemingly fictitious currency, but in reality the child is making an in-app purchase using real money.

523. Google's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

524. Illinois has enacted the Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), 815 ILCS §§ 505/1 *et seq.,* to protect Illinoisians from unfair methods of competition and unfair or deceptive acts or practices.

525. The ICFDBPA specifically states: "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deceptive, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice escribed in Section 2 of the 'Uniform Deceptive Trade Practices Act' [815 ILCS 510/2], approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts related to Section 5(a) of the Federal Trade Commission Act [15 U.S.C. § 45]." 815 ILCS § 505/2.

526. Each Defendant has violated the ICPDBPA by engaging in unfair methods of competition (e.g., conspiring and agreeing to use the same patented-addictive technology) and using unfair or deceptive acts or practices, including but not limited to the following:

   a. Using dark patterns and other unfair and deceptive practices to entice minors, like I.C., into in-game purchases and microtransactions, as described above;

   b. Using dark patterns and other unfair and deceptive practices that allow or allowed minors to make in-game purchases and microtransactions without parental consent or account holder consent;

   c. Knowingly making a false representation as to the characteristics, components, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services as safe for their intended use, while knowing that those products and services had been designed to be addictive;

   d. Advertising their goods or services as safe for use by minors with the intent to

sell them with addictive features built in;

    e.  Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

    f.  Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, like I.C., rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

    g.  Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth; and

    h.  Otherwise failing to disclose the use of addictive-patented technology and unlawful gaming tactics or devices within each Defendant's respective products.

527.   Epic Games violated the ICPDBPA, in part, because it:

    a.  Violated COPPA, as described above;

    b.  Designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm; and

    c.  Knew that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Epic Games marketed Fortnite as "educational"

and for use in the classroom.

528. Roblox Corp. violated the ICPDBPA, in part, because it:

    a.  Violated COPPA, as described above;

    b.  Designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm; and

    c.  Knew that its Roblox games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Roblox Corp. marketed Roblox as "educational" and for use in the classroom.

529. Mojang Studios and Microsoft violated the ICPDBPA, in part, because it:

    a.  Violated COPPA, as described above;

    b.  Designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm; and

    c.  Knew that its Minecraft games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Mojang Studios and Microsoft marketed Minecraft as "educational" and for use in the classroom.

530. Nintendo also violated the ICPDBPA, in part, because it:

    a.  Designed the Nintendo eShop as a platform to house addictive gaming products

95

and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm; and

b.  Knew that its Nintendo eShop platform contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its platforms for play by youth.

531.    Google also violated the ICPDBPA, in part, because it:

a.  Violated COPPA, as described above;

b.  Designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm; and

c.  Knew that its Google Play platform contains an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harm anywhere and instead market its platforms for play by youth.

532.    In Illinois, the General Assembly has enacted the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ULCS §§ 510/1 *et seq.,* to protect consumers from deceptive trade practices which provides that regardless of whether competition exists between the parties or actual confusion and misunderstanding exists.

533.     In Illinois, "[a] person engages in a deceptive trade practices when, in the course of his or her business, vocation, or occupation, the person:

> (1)     passes off goods or services as those of another;
>
> (2)     causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (3)     causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;
>
> (4)     uses deceptive representations or designations of geographic origin in connection with goods or services;
>
> (5)     represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;
>
> (6)     represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or second hand;
>
> (7)     represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;
>
> (8)     disparages the goods, services, or business of another by false or misleading representation of fact;
>
> (9)     advertises goods or services with intent not to sell them as advertised;
>
> (10)     advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;
>
> (11)     makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;
>
> (12)     engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS § 510/2.

534.     Each Defendant violated the UDTPA by using unfair or deceptive acts or practices

in connection with the sale and advertisements of its gaming products, identified herein. Those violations include but are not limited to:

a. Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services;

b. Advertising the goods or services with the intent not to sell them as advertised;

c. Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

d. Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, like I.C., rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

e. Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products, specifically:

  i. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

  ii. Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to

injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

iii. Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

iv. Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm; and

v. Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

f. Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, specifically:

i. Epic Games knew that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Epic Games

99

marketed Fortnite as "educational" and for use in the classroom;

ii. Roblox Corp. knew that its Roblox games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Roblox Corp. marketed Roblox as "educational" and for use in the classroom;

iii. Mojang Studios and Microsoft knew that its Minecraft games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Mojang Studios and Microsoft marketed Minecraft as "educational" and for use in the classroom;

iv. Nintendo knew that its Nintendo eShop platform contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its platforms for play by youth; and

v. Google knew that its Google Play platform contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its platforms for play by youth.

535. The Illinois General Assembly has recognized the importance of protecting the exploitation of unique personal information and has enacted the Illinois Biometric Information Privacy Act ("IBIPA"), 740 ILCS § 14/1 *et seq*., to prohibit the exploitation of unique personal information.

536. IBIPA prohibits companies, like Defendants, from collecting, storing, or giving out "biometric data," which includes things like face or fingerprint scans, without first giving notice and

getting consent. 740 ILCS § 14/20.

537.    Roblox Corp.'s "voice chat" feature, described above, violates IBIPA.

538.    Defendants have violated statutory and regulatory law, as identified above, and with each statutory violation, each Defendant proximately caused injury and damage to I.C. and Cynthia Jimenez. This damage includes the injuries and harms to I.C. and Cynthia Jimenez described above, including but not limited to I.C.'s addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's statutory violations, I.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

539.    Plaintiffs are within the class of persons that these statutes and regulations are intended to protect---and Plaintiffs' injuries and damages are the type of harm that these statutes and regulations are intended to prevent---therefore, each Defendant is *per se* negligent for violating the COPPA, ICFDPA, IUDTPA, and IBIPA..

## COUNT VIII
## NEGLIGENCE – ORDINARY
### (Against All Defendants)

540.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

541.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

542.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

543.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

544.    Each Defendant owed I.C. a duty to act as a reasonably careful company would under the circumstances.

545.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

546.    A reasonably careful company would protect I.C. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

547.    A reasonably careful company would not invite, encourage, or facilitate youth, such as I.C., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

548.    A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

> a.   Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

b. Roblox Corp. failed to disclose that it designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

c. Mojang Studios and Microsoft failed to disclose that they designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

d. Nintendo failed to disclose that it designed Nintendo eShop as a platform to house and push addictive content to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm; and

e. Google failed to disclose that it designed the Google Play app as a platform to house and push addictive content to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

549. I.C. was a foreseeable user of the Defendants' respective products.

550. Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of I.C.'s use of Defendants' respective products.

551. Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as I.C. in a reasonably foreseeable manner. More specifically:

a.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.  Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.  Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e.  Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social

isolation, negative consequences on cognitive processes, and other harmful effects.

552.     At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as I.C., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

553.     Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, such as I.C., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

554.     Each Defendant's conduct was closely connected to I.C.'s injuries and Plaintiffs' damages, which were highly certain to occur.

555.     Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed I.C.

556.     Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products, such as Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.*

557.     Each Defendant also owes a duty to not to engage in unfair or deceptive acts or practices, including but not limited to utilizing deception, fraud, false pretenses, misrepresentation,

or concealment in the conduct of any trade or commerce. *See* 815 ILCS 505/1, *et seq.*

558.     Each Defendant also owes a duty not to engage in deceptive trade practices in the course of business. *See* 815 ILCS 510/1, *et seq.*

559.     Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular game-play in order to avoid such risks.

560.     Each Defendant has breached the duties owed to I.C.

561.     Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.     Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including I.C.;

b.     Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including I.C., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c.  Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including I.C.;

    d.  Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users; and

    e.  Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

562.    Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

    a.  Failing to implement effective protocols to block users under the age of 13;

    b.  Failing to implement effective parental controls;

    c.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

    d.  Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content

and/or microtransactions;

e. Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f. Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

563. Each Defendant further breached the duty owed to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

564. Each Defendant also breached its duty owed under 815 ILCS § 505/1, *et seq.* not to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce.

565. Each Defendant also breached its duty owed under 815 ILCS § 510/1, *et seq.* not to engage in deceptive trade practices in the course of business.

566. A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users like I.C.; yet Defendants did not do this.

567. As a direct and proximate result of each Defendant's breach of one or more of its duties, I.C. has been injured and Plaintiffs were harmed. Such injuries and harm includes addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general

degradation of their family life.

568.     Each Defendant's breach of one or more of its duties is a proximate cause of I.C.'s injuries and the damages sustained by Plaintiffs.

569.     As a direct and proximate result of each of the Defendant's breach of duties, I.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

570.     Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

### COUNT IX
### GROSS NEGLIGENCE
### (Against All Defendants)

571.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

572.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

573.     Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

574.     Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

575.     Each Defendant owed I.C. a duty to act as a reasonably careful company would under the circumstances.

576.     A reasonably careful company would not create an unreasonable risk of harm from

and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

577.    A reasonably careful company would protect I.C. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

578.    A reasonably careful company would not invite, encourage, or facilitate youth, such as I.C., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did not just that.

579.    A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

    a.  Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

    b.  Roblox Corp. failed to disclose that it designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

    c.  Mojang Studios and Microsoft failed to disclose that they designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

    d.  Nintendo failed to disclose that it designed Nintendo eShop as a platform to

house and push addictive content to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm; and

g. Google failed to disclose that it designed the Google Play app as a platform to house and push addictive content to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

580. I.C. was a foreseeable user of the Defendants' respective products.

581. Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of I.C.'s use of Defendants' respective products.

582. Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as I.C. in a reasonably foreseeable manner. More specifically:

a. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

111

c. Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e. Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

583. At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as I.C., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

584. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, such as I.C., would not have realized the

112

potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

585.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular game-play in order to avoid such risks.

586.    Each Defendant's conduct was closely connected to I.C.'s injuries and Plaintiffs' damages, which were highly certain to occur.

587.    Each Defendant could have avoided Plaintiffs' injuries and damages with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed I.C.

588.    Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products, such as Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.*

589.    Each Defendant also owes a duty to not to engage in unfair or deceptive acts or practices, including but not limited to utilizing deception, fraud, false pretenses, misrepresentation, or concealment in the conduct of any trade or commerce. *See* 815 ILCS § 505/1, *et seq.*

590.    Each Defendant also owes a duty not to engage in deceptive trade practices in the course of business. *See* 815 ILCS § 510/1, *et seq.*

591.    Each Defendant failed to use even slight diligence in fulfilling the duties owed to

Plaintiffs.

592. Accordingly, each Defendant has grossly breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

    a. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including I.C.;

    b. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including I.C.;

    d. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users; and

e. Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

593. Each Defendant has grossly breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a. Failing to implement effective protocols to block users under the age of 13;

b. Failing to implement effective parental controls;

c. Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

e. Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f. Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

594. Each Defendant further grossly breached the duty owed to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products,

pursuant to 15 U.S.C. § 6501 *et seq.*

595. Each Defendant also grossly breached its duty owed under 815 ILCS § 505/1, *et seq.* not to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce.

596. Each Defendant also grossly breached its duty owed under 815 ILCS § 510/1, *et seq.* not to engage in deceptive trade practices in the course of business.

597. A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users like I.C.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

598. As a direct and proximate result of each Defendant's gross breach of one or more of its duties, I.C. has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

599. Each Defendant's breach of one or more of its duties is a proximate cause of I.C.'s injuries and the damages sustained by Plaintiffs.

600. As a direct and proximate result of each of the Defendant's breach of duties, I.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

601. Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT X
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

602.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

603.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

604.     As described herein, each of the Defendants designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

    a.   Epic Games designed Fortnite to be as addictive as possible and includes numerous psychological tricks to ensnare users, including but not limited to a "near miss" effect, random rewards, bright and vibrate colors, and continual gameplay variety;

    b.   Roblox Corp. designed Roblox with addictive properties including but not limited to constant variety, social aspects, and numerous characters, skins and other content available for purchase;

    c.   Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, including but not limited to a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

    d.   Nintendo designed the Nintendo eShop as a platform to house addictive gaming

products and to pushed users to make purchases of addictive materials on the platform; and

e. Google designed the Google Play app as a platform to house addictive gaming products and to push users to make purchases of addictive materials on the platform.

605. Each Defendant designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a. Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

b. Roblox Corporation designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

c. Mojang Studios and Microsoft designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d. Nintendo designed the Nintendo eShop in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content; and

e. Google designed the Google Play app in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content.

606.    Defendants intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, like I.C., to use each Defendants' respective product and for users, like I.C., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

607.    Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was extreme and outrageous, is beyond all possible bounds of decency, and utterly intolerable in a civilized community.

608.    Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was an abuse of power to affect users'—including I.C.'s—interests.

609.    Each Defendant knew that users, like I.C., would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off of users, including I.C., after initial purchase or download.

610.    Each Defendant intended to inflict emotional distress (*e.g.*, addiction) on users, like I.C., and knew that users, like I.C., would suffer emotional distress as a result of Defendants' conduct.

611.    Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct. More specifically, the family has endured I.C.'s bouts of gamer's rage and depression which has required out-patient counseling and medication therapy.

119

612.    Such conduct in intentionally creating products to addict and abuse children and cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community and Defendants knew there was a high probability the addicted minor would have gamer's rage and withdrawal symptoms which would cause emotional distress to the gamer, parents and other household members.

613.    No reasonable person would be expected to endure such emotional distress suffered by Plaintiffs as a result of each Defendant's conduct.

614.    I.C. was particularly susceptible to emotional distress from each Defendant's respective conduct due to their age and mental capabilities.

615.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Cynthia Jimenez and I.C. have experienced extreme emotional distress, family conflict, including stress, fear of I.C. and mental anguish, and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

616.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Cynthia Jimenez and I.C. have experienced extreme emotional distress, including depression and inability of I.C. to function at grade level without additional support services in the classroom, out-patient counseling and medication therapy.

617.    As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

618.    Further, each Defendant's outrageous conduct, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)
### [Alternative Pleading]

619.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

620.    Plaintiffs plead this in the alternative.

621.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Call of Duty, Roblox, Grand Theft Auto, Xbox Game Pass Ultimate, and Xbox Cloud Gaming.

622.    Each Defendant owed I.C. a duty to act as a reasonably careful company would under the circumstances.

623.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

624.    A reasonably careful company would protect I.C. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

625.     A reasonably careful company would not invite, encourage, or facilitate youth, such as I.C., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

626.     A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

a.   Epic Games designed Fortnite to be as addictive as possible and includes numerous psychological tricks to ensnare users, including but not limited to a "near miss" effect, random rewards, bright and vibrate colors, and continual gameplay variety;

b.    Roblox Corp. designed Roblox with addictive properties including but not limited to constant variety, social aspects, and numerous characters, skins and other content available for purchase;

c.   Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, including but not limited to a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

d.   Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and to pushed users to make purchases of addictive materials on the platform; and

e.   Google designed the Google Play app as a platform to house addictive gaming products and to push users to make purchases of addictive materials on the

platform.

627.     Each Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

    a.  Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

    b.  Roblox Corporation designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

    c.  Mojang Studios and Microsoft designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

    d.  Nintendo designed the Nintendo eShop in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content; and

    e.  Google designed the Google Play app in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive content.

628.     I.C. was a foreseeable user of the Defendants' respective products.

629.     Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of I.C.'s use of Defendants' respective products.

630.     Defendants' products, Roblox, Call of Duty, Fortnite, and Grand Theft Auto are

psychologically and neurologically addictive when used in their intended manner by their intended audience; and Defendants reasonably should have known that when used as intend by minors, like I.C., to use each Defendants' respective product and for users, like I.C., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

631. Each Defendant knew that users, like I.C., would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off of users, including I.C., after initial purchase or download.

632. At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as I.C., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

633. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, such as I.C., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

634. Each Defendant has breached the duties owed to I.C.

635. Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management,

maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

    a.   Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including I.C.;

    b.   Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including Plaintiff, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c.   Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including I.C.; and

    d.   Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users.

636.    Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products.

Those breaches include:

    a.  Failing to implement effective protocols to block users under the age of 13;

    b.  Failing to implement effective parental controls;

    c.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

    d.  Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

    e.  Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

    f.  Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

637.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users like I.C.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

638.    Each Defendant's conduct was closely connected to Plaintiffs' emotional distress, which was highly certain to occur.

639.    As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiffs have sustained emotional distress beyond what a reasonable person should be

126

expected to endure because of each Defendant's conduct.

640.     As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, I.C. has experienced extreme emotional distress, including depression and inability to function without supportive services at grade level, and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

641.     As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, Cynthia Jimenez and I.C. have experienced extreme emotional distress, including depression, a fractured familial relationship, and loss of parenting role.

642.     As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

643.     Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT XII
### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT
### 815 ILCS 505/1 *et seq.*
### (Against All Defendants)

644.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

645.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

646.     Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

647.     Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

648.     Illinois law prohibits-and deems it unlawful for any Defendant to engage in unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact.

649.     Each Defendant engaged in unfair or deceptive acts or practices in connection with the sale and advertisements of its gaming product, identified herein and therefore violated the Illinois Consumer Fraud and Deceptive Practices Act ("ICFDPA"), 815 ILCS § 815.505/1 *et. seq.* Those violations include but are not limited to:

a.     Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services;

b.     Advertising the goods or services with the intent not to sell them as advertised;

c.     Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

d.     Concealing, suppressing, and omitting material facts regarding the gaming

128

product and intending that others, like I.C., rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

e.   Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products, specifically:

   i.   Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

   ii.   Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

   iii.   Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

   iv.   Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive

use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm; and

v.     Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

f.     Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, specifically:

i.     Epic Games knew that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Epic Games marketed Fortnite as "educational" and for use in the classroom;

ii.    Roblox Corp. knew that its Roblox games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Roblox Corp. marketed Roblox as "educational" and for use in the classroom;

iii.   Mojang Studios and Microsoft knew that its Minecraft games

contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Mojang Studios and Microsoft marketed Minecraft as "educational" and for use in the classroom;

iv.     Nintendo knew that its Nintendo eShop platform contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its platforms for play by youth; and

v.      Google knew that its Google Play platform contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its platforms for play by youth.

650.    Each Defendant engaged in the aforementioned unfair or deceptive acts or practices in the conduct of their trade as a course of business, and in connection with the sale of goods or services to Illinois consumers, including Plaintiffs.

651.    Each Defendant intended for consumers, including I.C., to rely on their unfair and deceptive acts described herein, including their respective deceptive conduct in regard to in-game purchases and microtransactions, platforms, products, and in the concealment of material information regarding the safety of their products.

652.    Each Defendant intended for consumers, including I.C., to be unfairly treated by their unfair and deceptive conduct and to become addicted, abuse, or compulsive use their respective products in an effort to increase their own profits.

653.    Defendants' actions detailed herein constitute unfair methods of competition and

unfair or deceptive acts and trade practices in violation of the ICFDPA and those actions have caused Plaintiffs to suffer actual economic damages.

654.    Any reasonable consumer would have relied to their detriment on each Defendant's unfair and deceptive acts, detailed herein.

655.    Plaintiffs relied to their detriment on each Defendant's unfair or deceptive acts, including Defendants' respective misrepresentations and deceptions, in deciding to use Defendants' gaming products.

656.    Had each Defendant not engaged in the respective unfair and deceptive conduct described herein, I.C. would not have used each Defendant's respective products and Plaintiffs have been damaged.

657.    As a proximate result of each Defendant's violations of the ICFDPA, described above, Plaintiffs suffered actual calculable financial loss and continues to suffer such losses because Defendant's harm is ongoing.

658.    Each Defendant violated the ICFDPA in the manner described herein and, as a result of Defendants' countless violations of the ICFDPA, Plaintiffs are entitled to actual damages in an amount to be proven at trial, costs, and reasonable attorney's fees incurred in connection with prosecuting this claim.

659.    Plaintiffs also seek injunctive relief that would require Defendants to cease and desist from engaging in the deceptive and unlawful conduct described herein, including but not limited to, enjoining Defendants from continuing to direct and market microtransactions to anyone under the age of 18 years of age, enjoining online gaming access to minors after 6 p.m., and/or other measured deemed to be appropriate upon further discovery of the extent of Defendant's harms.

660. The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

661. The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, I.C. continues to use Defendants' respective products. While I.C. uses Defendants' respective products, they will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

662. Each Defendant engaged in unfair and deceptive trade practices, as described above, which was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, outrageous, unlawful, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers. This misconduct warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

663. Upon commencement of this action, Plaintiff will serve notice on the Attorney General or State's Attorney as required by 815 ILCS § 505/10a(d).

## COUNT XIII
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### 815 ILCS § 510/1 *et seq.*
### (Against All Defendants)

664. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

665. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

666.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

667.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

668.    In the course of their business, Defendants are prohibited from engaging in deceptive trade practices, and such practices are prohibited by the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 ILCS § 510/1 *et seq.*

669.    Each Defendant violated the IUDTPA when it engaged in deceptive trade practices in connection with the sale and advertisements of its gaming products, identified herein. Those violations include but are not limited to the following:

a.      Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services;

b.      Advertising the goods or services with the intent not to sell them as advertised;

c.      Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

d.      Passing off goods or services as those of another;

e.      Causing confusion or misunderstanding as to the source, sponsorship, affiliation, or employer of "friends" and "influencers" facilitating microtransactions and in-game purchases;

f.      Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, like I.C., rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

g.      Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products, specifically:

   i.      Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

   ii.     Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

   iii.    Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

   iv.     Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on

135

the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm; and

v.    Google designed the Google Play app as a platform to house addictive gaming products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

h.    Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, specifically:

i.    Epic Games knew that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Epic Games marketed Fortnite as "educational" and for use in the classroom;

ii.    Roblox Corp. knew that its Roblox games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Roblox Corp. marketed Roblox as "educational" and for use in the classroom;

136

     iii.      Mojang Studios and Microsoft knew that its Minecraft games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Mojang Studios and Microsoft marketed Minecraft as "educational" and for use in the classroom;

     iv.      Nintendo knew that its Nintendo eShop platform contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its platforms for play by youth; and

     v.      Google knew that its Google Play platform contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its platforms for play by youth.

670.    Each Defendant engaged in the aforementioned deceptive trade practices in the in the course of business and in connection with the sale of goods or services to Illinois consumers, including Plaintiffs.

671.    Each Defendant also violated the IUDTPA by failing to provide adequate notice to parents—including Cynthia Jimenez and I.C.—about collecting personal information of children—like I.C.— under the age of 13, as required by the Children's Online Privacy Protection Act and accompanying regulations.

672.    Defendants' actions detailed herein constitute deceptive acts and trade practices in violation of the IUDTPA.

673.    Plaintiffs relied to their detriment on each Defendant's deceptive acts, including

Defendants' respective misrepresentations and deceptions, in deciding to use Defendants' gaming products.

674.    As a proximate result of each Defendant's deceptive and unconscionable trade practices, described above, Plaintiffs suffered actual injuries and damages, including financial loss, I.C.'s addiction (aka "Internet Gaming Disorder") and other physical injuries, emotional distress, mental anguish, and other damages as described herein and is likely to continue to suffer these damages due to the ongoing nature of Defendants' deceptive trade practices.

675.    Had each Defendant not engaged in the respective deceptive conduct described herein, I.C. would not have used each Defendant's respective products and Plaintiffs would not have suffered financial loss.

676.    Each Defendant violated the IUDTPA in the manner described herein and, as a result of Defendants' countless violations of the IUDTPA, Plaintiffs are entitled to damages in an amount to be proven at trial, costs and attorneys' fees attorney's fees incurred in connection with prosecuting this claim.

677.    Plaintiffs also seek injunctive relief that would require Defendants to cease and desist from engaging in the deceptive and unlawful conduct described herein, including but not limited to enjoining Defendants from continuing to direct and market microtransactions to anyone under the age of 18 years of age, enjoining online gaming access to minors after 6 p.m. and/or other measures deemed to be appropriate upon further discovery of the extent of Defendant's harms.

678.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

679.    The nature of the intentional and fraudulent acts that created safety concerns for

Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, I.C. continues to use Defendants' respective products. While I.C. uses Defendants' respective products, they will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

680.    Each Defendant engaged in unconscionable and deceptive trade practices, as described above, which was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, outrageous, unlawful, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers. This misconduct warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

**COUNT XIV**
**FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

681.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

682.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

683.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

684.    Each Defendant made representations of material facts about their respective

139

products, while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

685.    These false representations involve misstatements about the safety of each Defendant's product identified herein and include, but are not limited to:

a.    Epic Games misrepresented Fortnite as safe for use by minors and young adults, including I.C., while knowing that abuse, addiction, and compulsive use by youth can lead to injury, and knowing that it had designed and developed Fortnite to be as addictive as possible;

b.    Roblox Corp. misrepresented Roblox as safe for use by minors and young adults, including I.C., while knowing that abuse, addiction, and compulsive use by youth can lead to injury, and knowing that it had designed and developed Roblox to be as addictive as possible;

c.    Mojang Studios and Microsoft misrepresented Minecraft as safe for use by minors and young adults, including I.C., while knowing that abuse, addiction, and compulsive use by youth can lead to injury, and knowing that it had designed and developed Minecraft to be as addictive as possible;

d.    Nintendo misrepresented that its Nintendo eShop was safe for use by minors and young adults, while knowing that it was designed and developed with addictive features to keep users, like I.C., purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to users, like I.C.; and

e.    Google misrepresented that its  Google Play app was safe for use by minors and

140

young adults, while knowing that it was designed and developed with addictive features to keep users, like I.C., purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to I.C. and other users like them.

686. Defendant knew their games posed risk to minors, like I.C., based on internal research and external studies known in the industry and to each Defendant; yet, each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like I.C., to purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

687. Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use. These misrepresentations of material fact include, but are not limited to:

    a. Epic Games marketed Fortnite as "educational" and for use in the classroom despite knowing that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by I.C.;

    b. Roblox Corp. marketed Roblox as "educational" and for use in the classroom despite knowing that its Roblox games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by I.C.;

    c. Mojang Studios and Microsoft marketed Minecraft as "educational" and for use

141

in the classroom despite knowing that its Minecraft games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by I.C.;

d.  Nintendo knew that its Nintendo eShop platform, as well as the Fortnite and Minecraft games, contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but intentionally marketed  its platform for play by youth and directed its misstatements towards users of Fortnite, Minecraft, and other games designed, developed and utilizing the patents and technology described herein; and

e.  Google knew that its Google Play platform, as well as the Roblox and Minecraft games, contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but intentionally marketed its platform for play by youth and directed its misstatements towards users of Roblox, Minecraft, and other games designed, developed and utilizing the patents and technology described herein.

688.   By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

689.   Each Defendant knew that its misstatements and false representations, as identified herein, were material.

690.   Each Defendant knew that its misstatements and false representations, as identified

herein, were false.

691.    The misrepresentations described herein were made to Plaintiffs—particularly to I.C.—prior to their purchase of each Defendant's product and to I.C. while he was using Defendants' products as intended.

692.    Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

693.    I.C. and their legal guardian, Cynthia Jimenez, relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

694.    Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product was justifiable.

695.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

696.    As a direct and proximate result of each of the Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs have been damaged. Such damage includes I.C.'s mental harm (and the permanency thereof); pain and suffering; mental

anguish; I.C.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to I.C.'s mental harm. I.C.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

697.    Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

698.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XV
## FRAUDULENT MISREPRESENTATION AND CONCEALMENT
### (Against All Defendants)

699.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

700.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

701.    As detailed herein, each Defendant knew about the defective conditions of its

respective products and that the products posed serious health risks to users, particularly minors and young adults.

702.    Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

a.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the publics and product users, including Plaintiffs;

b.  Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  Mojang Studios and Microsoft designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.  Nintendo designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to make purchases on the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

e.  Google designed the Google Play app as a platform to house addictive gaming

products and pushed users to make purchases through the platform, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

703. Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce youth, including I.C., to continue using its respective products and avoid losing users and revenue.

704. Each Defendant knew that its concealment was material.

705. By intentionally concealing material information, including, but not limited to, concealing the risk of abuse, addiction, and compulsive use designed in each of its respective products, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

706. Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

707. A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

708. If Defendants had not concealed material facts about the safety of their respective products, including but not limited to concealing that the products had been designed to be

addictive, then Plaintiffs would not have purchased, downloaded played, continued to use, and/or purchased downloadable game content or in-game transactions in each Defendant's product.

709.     As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

710.     As a direct and proximate result of each Defendant's concealment of material information, I.C. has been injured and Plaintiffs have sustained damages, as described herein.

711.     Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

712.     Further, each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore,  an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

713.     Defendants' fraudulent concealment tolls any applicable statute of limitations.

## COUNT XVI
## FRAUDULENT INDUCEMENT
### (Against All Defendants)

714.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

715.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

716.    Within these products, each Defendant included the ability for users, including Plaintiff, to purchase in-game downloadable content or microtransactions.

717.    Users of Defendants' products, including minors such as I.C., were induced into microtransactions by each Defendant to make such purchases through false representations and material misstatements built into each of the Defendants' products. Defendants' methods of fraudulent inducement include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage purchase, and disguised features of the Defendants' products, which misrepresent to users, like Plaintiff, that game-selected purchases would help them advance in the game or complete necessary missions.

718.    Defendants made these false representations and material nondisclosures with intent to induce I.C. into the microtransaction.

719.    At the time each Defendant utilized these technologies to induce I.C. to make in-game purchases, each Defendant knew that the representations made through the game were false and existed only to entice I.C. to continue spending.

720.    Each Defendant intended to induce I.C. to continue purchasing in-game downloadable content and/or in-game transactions within its respective product.

721.    At the same time, each Defendant knew that the inducements to make additional

in-game purchases served only to increase users'—including I.C.'s—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

722.    I.C. reasonably relied on the enticements within each Defendant's product to make several in-game purchases that actually had little to no value to I.C. within the game.

723.    Had I.C. known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, I.C. never would have agreed to contract to purchase in-game downloadable content or microtransactions.

724.    Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

725.    Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly concealed those findings, in order to avoid losing revenue, and to induce I.C. to continue using each Defendant's respective products.

726.    In conjunction with Defendants' acts of concealment, each Defendant knowingly and recklessly misled the public, users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

727.    Each Defendant intended its concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

728.    By intentionally making numerous material misrepresentations, downplaying any

potential harm associated with its respective products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

729.    As a direct and proximate cause of each of the Defendant's deceptive and fraudulent conduct, I.C. is addicted to Defendants' respective products and is unable to control their gameplay or in-game purchases.

730.    I.C. was induced into microtransactions resulting in thousands of dollars spent on in-game purchases or microtransactions.

731.    Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like I.C., would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

732.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Plaintiffs justifiably relied on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game transactions in each Defendant's product.

733.    As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game transactions in each

Defendant's product.

734.    As a direct and proximate result of each of the Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each of the Defendant's inducements to utilize their platforms, download and play their games, and/or continuously spend funds through its products.

735.    As a direct and proximate result of each Defendant's fraudulent inducement Plaintiffs have been damaged. More specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions to parents that minors gaming behavior is collected and tracked and nondisclosure of the risk of gaming addiction, and that deceitful conduct is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

736.    Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XVII
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)
### (Pleaded in the Alternative)

737.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

738.    Plaintiffs plead this in the alternative.

739.    At all relevant times, each Defendant was engaged in the business of designing,

developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by I.C.: Fortnite, Roblox, Minecraft, Nintendo Switch, and Google Play.

740. Each Defendant---and all designers, developers, manufacturers, publishers, and suppliers of video gaming products---had a duty to communicate accurate information and to make truthful statements of material fact to the public. This duty includes but is not limited to telling Plaintiffs the truth about the addictive design and dangerous condition of Defendants' products and that those products posed serious health risks to users, particularly youth.

741. As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its respective products pose serious health risks to users, particularly minors like I.C.; yet, each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiffs, downplaying any potential harm associated with its products and reassuring the public, users and plaintiff that its products were safe or even beneficial for children to use:

      a. Epic Games misrepresented Fortnite as safe for use by minors and young adults, even marketing the games as "educational" and for use in classrooms, despite knowing that, due to its own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

      b. Roblox Corp. misrepresented Roblox as safe for use by minors and young adults, even marketing the games as "educational" and for use in classrooms, despite knowing that, due to their own design, the games contained an inherent

risk of abuse, addiction, and compulsive use by youth that can lead to injury;

c.  Mojang Studios and Microsoft misrepresented Minecraft as safe for use by minors and young adults, even marketing the games as "educational" and for use in classrooms, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

d.  Nintendo misrepresented its Nintendo eShop platform and Switch close as safe for use by minors and young adults, even marketed these products toward youth, despite knowing that, due to its own design, the products and the games available therein contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury; and

e.  Google misrepresented its Google Play platform as safe for use by minors and young adults, despite knowing that, due to its own design, the platform and the games available therein contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury.

742.    Each Defendant made these false statements and misrepresentations with intent to induce Plaintiffs (and the general public) to purchase and use their respective products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

743.    Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiffs and the public.

744.   Defendants' false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiffs to purchase and use Defendants' products---and Cynthia Jimenez relied upon Defendants' false statements and misrepresentations in allowing her child to use Defendants' games and gaming products, Likewise, I.C. relied on Defendants' false statements and misrepresentations in conjunction with in-game purchases and Defendants' deceptive microtransaction mechanisms, including the use of fake "friends" to induce I.C. into spending money.

745.   Plaintiffs' reliance on Defendants' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

746.   Plaintiffs have been damaged because of each Defendant's false statements and their reliance on Defendants' statements.  This damage includes the injuries and harms to I.C. and Cynthia Jimenez described above, including but not limited to I.C.'s addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's material misrepresentations, I.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

747.   Plaintiffs would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of Defendants' gaming products.

## COUNT XVII
## CIVIL CONSPIRACY
### (Against All Defendants)

748.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

749.     A civil conspiracy occurs when two or more persons have combined to accomplish a purpose that is unlawful or oppressive, or to accomplish some purpose (that is not in itself unlawful, impressive, or immoral) by unlawful, oppressive, or immoral means to the injury of another. Such a conspiracy occurred here.

750.     Defendants conspired to addict users, like I.C., to Defendants' products, specifically the products described herein.

751.     As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like I.C., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by I.C. and other users.

752.     Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like I.C., addicted to Defendants' products.

753.     More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like G.D, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

754.     As described herein, Mojang Studios and Microsoft knowingly conspired and

155

otherwise acted in concert to violate the ICFDPA, IUDTPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design the Minecraft game franchise to addict minors and young adults.

755.    In particular, Mojang Studios and Microsoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Minecraft games that addicted and harmed I.C.

756.    As described herein, Nintendo conspired with and acted in concert with Epic Games, Mojang Games, and Microsoft to distribute, market, supply, and/or sell the Fortnite and Minecraft video games and all in-game downloadable content and in-game purchases contained therein through Nintendo eShop in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

757.    As described herein, Google conspired with and acted in concert with Roblox Corp., Mojang Games, and Microsoft to distribute, market, supply, and/or sell the Roblox and Minecraft video games and all in-game downloadable content and in-game purchases contained therein through Google Play in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

758.    Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including I.C., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

759.     Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including I.C.

760.     These conspiracies allowed Defendants to maximize profits, all while causing significant harm to users.

761.     Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

762.     The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

763.     The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conspiring to make their games addicting, I.C. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of their addiction, Defendants' defective design and Defendants' failure to warn consumers, like I.C., about the addictive qualities and components of those products.

### COUNT XIX
### IN-CONCERT LIABILITY
#### (Against All Defendants)

764.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

765.     In-concert liability arises where one party acts in concert with another party who commits a tort. The party acting in concert with the tortfeasor becomes liable for the tortfeasor's conduct as if there were a joint enterprise or mutual agency.

766.     As described herein and at all times material hereto, each Defendant intentionally

targeted users, including minors like I.C., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by I.C. and other users.

767. Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like I.C., addicted to Defendants' products.

768. More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like G.D, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

769. Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

770. Each Defendant knew of the risk of abuse, addiction, and compulsive use by youth arising from the harmful content contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other Defendants to do the same.

771. Additionally, Nintendo and Google Play acted in concert with each of the other Defendants to place addictive games and technology on their respective platforms and encourage the purchase and use of such content by minors and young adults.

772. Nintendo and Google Play do not place any restrictions on game developers regarding collecting and tracking a minor player's, such as I.C., game playing behavior, game

stimulus to trigger purchasing microtransactions, or amount of time a minor can spend playing games; each defendant profits from this lack of restrictions receiving, on information and belief, up to 30% of the profits from microtransactions.

773.    Each Defendant thus assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

774.    Such concerted conduct allowed Defendants to maximize profits, all while causing significant harm to users.

775.    Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

776.    The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

777.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conspiring to make their games addicting, I.C. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of their addiction, Defendants' defective design and Defendants' failure to warn consumers, like I.C., about the addictive qualities and components of those products.

## VII.    PRAYER FOR RELIEF

Plaintiffs Cynthia Jimenez, Individually and on Behalf of I.C., a Minor, respectfully request judgment in their favor and against each of the Defendants to the full extent of the law, as follows:

    a.    For an award of compensatory damages for I.C. in an amount to be determined at trial on the following elements of damage:

        i.    The nature, extent, duration, and permanency of I.C.'s injuries;

ii. The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

iii. The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future in accordance with the Family Expense Act;

iv. The loss of a normal life.

v. The pain, suffering, and mental anguish experienced in the past;

vi. The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

vii. The present value of any loss of ability to earn in the future;

viii. The reasonable expense of any necessary help in I.C.'s home or school which has been required as a result of I.C.'s injuries; and

ix. The present value of any necessary help in I.C.'s home or school reasonably certain to be required in the future;

x. Actual financial loss;

b. For an award of compensatory damages for Cynthia Jimenez, in an amount to be determined at trial, to fairly compensate her for mental anguish, emotional distress, pain and suffering.

c. Attorneys' fees and court costs for violations of Illinois Deceptive Trade Practice Act;

d. For an award of actual damages, including economic and pecuniary loss, in an

amount to be determined at trial;

e. For injunctive relief;

f. For an award of punitive damages in an amount to be proven at trial;

g. For an award of fees, costs and attorneys' fees, as allowable by law;

h. For pre-judgment and post-judgment interest, as allowable by law; and

i. For such other and further relief as this Court may deem just and proper.

## VIII. <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Plaintiffs Cynthia Jimenez,
Individually and on behalf of I.C., a minor,

<u>by:</u>

<u>/s/ Breean Walas</u>

**BULLOCK WARD MASON LLC**
Breean "BW" Walas (IL6287617)
Tina Bullock*
Danielle Ward Mason*
Rachel Minder (IL6320342)**
3350 Riverwood Pkwy., Suite 1900
Atlanta, GA 30339
Tel: (833) 296-5291
bwalas@bwmlaw.com
tina@bwmlaw.com
danielle@bwmlaw.com
rachel@bwmlaw.com

*Attorneys for Plaintiffs*

*motions to appear pro hac vice pending*

**admission pending*

161

DEC,TRF

# U.S. District Court
## Southern District of Illinois (East St. Louis)
## CIVIL DOCKET FOR CASE #: 3:23-cv-03678-SPM

Jiminez v. Microsoft Corporation et al

Assigned to: Judge Stephen P. McGlynn

Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 11/14/2023

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

**Plaintiff**

**Cynthia Jiminez**

*Individually and on Behalf of I.C., a Minor*

represented by **Danielle Ward Mason**
Bullock Ward Mason
7955 Oak Crest Place
Montgomery, AL 36116
334-451-0757
Email: danielle@bwmlaw.com
*ATTORNEY TO BE NOTICED*

**Tina Bullock**
Bullock Ward Mason LLC
P. O. Box 426
Acworth, GA 30101
770-500-6205
Email: tina@bwmlaw.com
*ATTORNEY TO BE NOTICED*

**Breean Walas**
Bullock Ward Mason
3350 Riverwood Pkwy
Suite 1900
Atlanta, GA 30339
833-296-5291
Fax: 833-895-2022
Email: bwalas@bwmlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Microsoft Corporation**

represented by **Ambika Kumar**
Davis Wright Tremaine LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104-1610
206-757-8030
Email: ambikakumar@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kurt E. Reitz**
Thompson Coburn LLP - Belleville
525 West Main Street
Suite 300
Belleville, IL 62220
618-277-4700
Email: kreitz@thompsoncoburn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Sieff**
Davis Wright Tremaine LLP
865 S. Figueroa Street
Suite 2400
Los Angeles, CA 90017
213-633-6800
Email: adamsieff@dwt.com
*ATTORNEY TO BE NOTICED*

**David Sneed**
Covington & Burling LLP
850 Tenth St. NW
Washington DC, DC 20001
202-662-5027
Email: dsneed@cov.com
*ATTORNEY TO BE NOTICED*

**Gary Rubman**
Covington & Burling LLP
One City Center
850 Tenth Street N.W.
Washington, DC 20001-4956
202-662-5465
Email: grubman@cov.com
*ATTORNEY TO BE NOTICED*

**Kathryn Cahoy**
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
650-632-4700
Email: kcahoy@cov.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Epic Games, Inc.**                         represented by **Adam Minchew**
Hueston Hennigan LLP
1 Little W 12th Street
New York, NY 10014
646-216-8466
Fax: 888-866-4825
Email: aminchew@hueston.com

*ATTORNEY TO BE NOTICED*

**Allison Libeu**
Hueston Hennigan LLP
620 Newport Center Drive
Suite 1300
Newport Beach, CA 92660
949-273-4153
Fax: 888-866-4825
Email: alibeu@hueston.com
*ATTORNEY TO BE NOTICED*

**Michael Alexander McCaskey**
Swanson, Martin & Bell, LLP - Chicago, IL
One IBM Plaza
330 North Wabash Street
Suite 3300
Chicago, IL 60611
312-321-9100
Fax: 312-321-0990
Email: mmccaskey@smbtrials.com
*ATTORNEY TO BE NOTICED*

**Moez M Kaba**
Hueston Hennigan LLP
523 West Sixth Street
Ste 400
Los Angeles, CA 90014
213-788-4340
Fax: 888-866-4825
Email: mkaba@hueston.com
*ATTORNEY TO BE NOTICED*

**Padraic Foran**
Hueston Hennigan LLP
523 West Sixth Street
Ste 400
Los Angeles, CA 90014
213-788-4340
Fax: 888-866-4825
Email: pforan@hueston.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Roblox Corporation**                    represented by  **L. Bryan Hopkins**
Husch Blackwell LLP
8001 Forsyth Boulevard
Ste 1500
St. Louis, MO 63105
314-480-1954
Fax: 314-480-1505
Email: bryan.hopkins@huschblackwell.com
*ATTORNEY TO BE NOTICED*

**Morgan Elizabeth Fox**
Husch Blackwell LLP
8001 Forsyth Boulevard
Ste 1500
St. Louis, MO 63105
314-345-6284
Fax: 314-480-1505
Email: morgan.fox@huschblackwell.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mojang Studios**                        represented by   **Ambika Kumar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kurt E. Reitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Sieff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Sneed**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gary Rubman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Cahoy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nintendo of America, Inc.**             represented by   **Megan B. Poetzel**
Jenner & Block LLP
353 N Clark St
60654
Chicago, IL 60654
312-222-9350
Email: mpoetzel@jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alison I. Stein**
Jenner & Block LLP-NY
1155 Avenue of the Americas
New York, NY 10036
212-891-1622
Email: astein@jenner.com

*ATTORNEY TO BE NOTICED*

**Cayman Mitchell**
Jenner & Block LLP-NY
1155 Avenue of the Americas
New York, NY 10036
212-891-1638
Email: cmitchell@jenner.com
*ATTORNEY TO BE NOTICED*

**Nicole A. Allen**
Jenner & Block, LLP
353 North Clark Street
Suite 4100
Chicago, IL 60654-3456
312-923-2868
Fax: 312-923-2968
Email: nallen@jenner.com
*TERMINATED: 02/01/2024*

**Defendant**

**Google, LLC**                      represented by    **Brian M. Willen**
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas
40th Floor
New York, NY 10019-6022
212-999-5800
Email: bwillen@wsgr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Chiou**
Wilson Sonsini Goodrich & Rosati, P.C.
953 East Third Street
Suite 100
Los Angeles, CA 90013
323-210-2987
Fax: 866-974-7329
Email: cchiou@wsgr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy Paul Auster**
Wilson Sonsini Goodrich, et al.
1301 Avenue of Americas
40th Floor
New York, NY 10019
212-453-2862
Fax: 212-999-5800
Email: jauster@wsgr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Schmidt**

Bryan Cave Leighton Paisner - St. Louis
One Metropolitan Square
211 North Broadway
Suite 3600
St. Louis, MO 63102
314-259-2000
Fax: 314-259-2020
Email: cjschmidt@bryancave.com
*ATTORNEY TO BE NOTICED*

**Seth Reid**
Bryan Cave Leighton Paisner LLP
One Metropolitan Square
211 N Broadway Ste 3600
Saint Louis, MO 63102
314-259-2951
Email: seth.reid@bclplaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/14/2023 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AILSDC-5234230.), filed by cynthia jiminez. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons)(Walas, Breean) (Entered: 11/14/2023) |
| 11/15/2023 | 2 | NOTICE OF INITIAL ASSIGNMENT TO A U.S. MAGISTRATE JUDGE: This case has been randomly assigned to United States Magistrate Judge Mark A. Beatty pursuant to Administrative Order 347. The parties are advised that their consent is required if the assigned Magistrate Judge is to conduct all further proceedings in this case, including trial and final entry of judgment pursuant to 28 U.S.C. 636(c) and Federal Rule of Civil Procedure 73. As set forth in Administrative Order No. 347, each party will be required to file a Notice and Consent to Proceed Before a Magistrate Judge Jurisdiction form indicating consent or non-consent to the jurisdiction of the assigned Magistrate Judge. If all parties do not consent to the Magistrate Judge's jurisdiction, the case will be randomly assigned to a district judge for all further proceedings and the parties cannot later consent to reassignment of the case to a magistrate judge. The parties are further advised that they are free to withhold consent without adverse substantive consequences. Within 21 days of this Notice, the following party or parties must file the attached form indicating consent to proceed before the assigned Magistrate Judge or an affirmative declination to consent: cynthia jiminez. A link regarding the magistrate judges in this district is attached for your convenience: https://www.ilsd.uscourts.gov/documents/BenefitsofConsent.pdf. All future documents must bear case number 23-cv-3678-MAB. Consent due by 12/6/2023. (jle) (Entered: 11/15/2023) |
| 11/15/2023 | 3 | Summons Issued as to Epic Games, Inc., Google, LLC, Microsoft Corporation, Mojang Studios, Nintendo of America, Inc., Roblox Corporation. Originals mailed to Attorney Walas. (jle) (Entered: 11/15/2023) |
| 11/15/2023 | 4 | NOTICE OF ACTION re 1 Complaint, filed by cynthia jiminez. Because the required Disclosure Statement was not filed with the attached, this matter is being submitted to the presiding judge for further action. A copy of this Court's form Disclosure Statement can be found at https://www.ilsd.uscourts.gov/Forms.aspx. (jle)THIS TEXT ENTRY IS AN |

| | | ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 11/15/2023) |
|---|---|---|
| 11/16/2023 | 5 | Federal Rule of Civil Procedure 7.1 Disclosure Statement by Cynthia Jiminez. (Walas, Brean) (Entered: 11/16/2023) |
| 12/01/2023 | 6 | STRICKEN NOTICE by Cynthia Jiminez *Request to Waive Service of Summons* (Walas, Brean) Modified on 12/4/2023 (kdw). (Entered: 12/01/2023) |
| 12/04/2023 | 7 | STRICKEN NOTICE OF ACTION re 6 Notice (Other) filed by Cynthia Jiminez, 3 Summons Issued, 5 Federal Rule of Civil Procedure 7.1 Disclosure Statement filed by Cynthia Jiminez, 1 Complaint, filed by Cynthia Jiminez. See Local Rule 83.1(g). In all cases filed in, removed, or transferred into this Court, the attorney filing the initiating document need not file a separate entry of appearance. Once the initiating document is filed, any attorney other than the one who filed the initiating document must file a separate entry of appearance before filing a document or appearing before the court. Attorney Walas does not have a Notice of Appearance on file in this case. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. Modified on 12/4/2023 (kdw). (Entered: 12/04/2023) |
| 12/04/2023 | 8 | NOTICE STRIKING ELECTRONICALLY FILED DOCUMENTS striking 6 Notice (Other) filed by Cynthia Jiminez. Incorrect event selected. Select the event that most closely matches the document being filed. For this document, the correct event is "Request for Waiver of Service" under the heading "Initial Pleadings and Service". Filer will need to re-file the document. In addition doc 7 Notice of Action was entered in error. No further action required by the filer regarding doc 7 . (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 12/04/2023) |
| 12/06/2023 | 9 | CONSENT/NON-CONSENT TO U.S. MAGISTRATE JUDGE - sealed pending receipt from all parties. (Walas, Brean) (Entered: 12/06/2023) |
| 12/07/2023 | 10 | NOTICE TERMINATING JUDGE ASSIGNMENT: Pursuant to Administrative Order Nos. 347 and 367, and a request for reassignment having been received, this case, in its entirety, is hereby reassigned to Judge Stephen P. McGlynn for further proceedings. Magistrate Judge Mark A. Beatty no longer assigned to the case. All future documents must bear case number 23-3678-SPM. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 12/07/2023) |
| 12/11/2023 | 11 | REQUEST FOR WAIVER of Service sent to Epic Games on 11/29/2023 by All Plaintiffs. Waiver of Service due by 12/29/2023. (Walas, Brean) (Entered: 12/11/2023) |
| 12/12/2023 | 12 | STRICKEN WAIVER OF SERVICE Returned Executed by Cynthia Jiminez. Microsoft Corporation waiver sent on 11/22/2023, answer due 1/22/2024. (Walas, Brean) Modified on 12/12/2023 (kdw). (Entered: 12/12/2023) |
| 12/12/2023 | 13 | WAIVER OF SERVICE Returned Executed by Cynthia Jiminez. Mojang Studios waiver sent on 12/12/2023, answer due 2/12/2024. (Walas, Brean) (Entered: 12/12/2023) |
| 12/12/2023 | 14 | NOTICE STRIKING ELECTRONICALLY FILED DOCUMENTS striking 12 Waiver of Service Executed filed by Cynthia Jiminez. Document stricken per filer's request, correct document with correct dates to be filed. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 12/12/2023) |
| 12/12/2023 | 15 | WAIVER OF SERVICE Returned Executed by Cynthia Jiminez. Microsoft Corporation waiver sent on 12/12/2023, answer due 2/12/2024. (Walas, Brean) (Entered: 12/12/2023) |

| | | |
|---|---|---|
| 12/13/2023 | 16 | WAIVER OF SERVICE Returned Executed by Cynthia Jiminez. Nintendo of America, Inc. waiver sent on 12/12/2023, answer due 2/12/2024. (Walas, Breean) (Entered: 12/13/2023) |
| 12/18/2023 | 17 | WAIVER OF SERVICE Returned Executed by Cynthia Jiminez. Google, LLC waiver sent on 12/18/2023, answer due 2/16/2024. (Walas, Breean) (Entered: 12/18/2023) |
| 12/20/2023 | 18 | WAIVER OF SERVICE Returned Executed by Cynthia Jiminez. Roblox Corporation waiver sent on 12/14/2023, answer due 2/12/2024. (Walas, Breean) (Entered: 12/20/2023) |
| 01/22/2024 | 19 | NOTICE of Appearance by Michael Alexander McCaskey on behalf of Epic Games, Inc. (McCaskey, Michael) (Entered: 01/22/2024) |
| 01/23/2024 | 20 | NOTICE of Appearance by L. Bryan Hopkins on behalf of Roblox Corporation (Hopkins, L.) (Entered: 01/23/2024) |
| 01/23/2024 | 21 | NOTICE of Appearance by Nicole A. Allen on behalf of Nintendo of America, Inc. (Allen, Nicole) (Entered: 01/23/2024) |
| 01/23/2024 | 22 | Federal Rule of Civil Procedure 7.1 Disclosure Statement by Roblox Corporation. (Hopkins, L.) (Entered: 01/23/2024) |
| 01/23/2024 | 23 | Federal Rule of Civil Procedure 7.1 Disclosure Statement by Nintendo of America, Inc. identifying Corporate Parent Nintendo Co., Ltd. for Nintendo of America, Inc.. (Allen, Nicole) (Entered: 01/23/2024) |
| 01/25/2024 | 24 | NOTICE of Appearance by Kurt E. Reitz on behalf of Microsoft Corporation (Reitz, Kurt) (Entered: 01/25/2024) |
| 01/25/2024 | 25 | NOTICE of Appearance by Kurt E. Reitz on behalf of Mojang Studios (Reitz, Kurt) (Entered: 01/25/2024) |
| 01/25/2024 | 26 | Consent MOTION for Extension of Time to File Answer re 1 Complaint, *and to Enter Agreed Briefing Schedule* by Microsoft Corporation, Mojang Studios. (Reitz, Kurt) (Entered: 01/25/2024) |
| 01/25/2024 | 27 | Federal Rule of Civil Procedure 7.1 Disclosure Statement by Microsoft Corporation. (Reitz, Kurt) (Entered: 01/25/2024) |
| 01/25/2024 | 28 | Federal Rule of Civil Procedure 7.1 Disclosure Statement by Mojang Studios identifying Corporate Parent Microsoft Corporation, Corporate Parent Microsoft Ireland Research Unlimited Company, Corporate Parent Microsoft Round Island One Unlimited Company for Mojang Studios. (Reitz, Kurt) (Entered: 01/25/2024) |
| 01/25/2024 | 29 | Federal Rule of Civil Procedure 7.1 Disclosure Statement by Epic Games, Inc. identifying Other Affiliate Tencent Holdings Ltd., Other Affiliate Timothy Sweeney for Epic Games, Inc.. (McCaskey, Michael) (Entered: 01/25/2024) |
| 01/25/2024 | 30 | ORDER: Defendants' 26 Consent Motion for Extension of Time to File Answer *and to Enter Agreed Briefing Schedule* is **GRANTED**. Defendants are **ORDERED** to respond to Plaintiff Jimenez's 1 Complaint no later than March 29, 2024. Signed by Judge Stephen P. McGlynn on 1/25/2024. (trf) (Entered: 01/25/2024) |
| 01/26/2024 | 31 | NOTICE of Appearance by Megan B. Poetzel on behalf of Nintendo of America, Inc. (Poetzel, Megan) (Entered: 01/26/2024) |
| 01/26/2024 | 32 | STRICKEN MOTION to Appear Pro Hac Vice *by Alison Stein* by Attorney Megan B. Poetzel $200 fee paid,receipt number AILSDC-5294630 by on behalf of Nintendo of America, Inc.. (Poetzel, Megan) Modified on 1/30/2024 (kdw). (Entered: 01/26/2024) |

| 01/26/2024 | 33 | STRICKEN MOTION to Appear Pro Hac Vice *by Cayman Mitchell* by Attorney Megan B. Poetzel $200 fee paid,receipt number AILSDC-5294667 by on behalf of Nintendo of America, Inc.. (Poetzel, Megan) Modified on 1/30/2024 (kdw). (Entered: 01/26/2024) |
| --- | --- | --- |
| 01/29/2024 | 34 | ORDER granting 40 Motion to Appear Pro Hac Vice by Attorney Stein on behalf of defendant Nintendo of America, Inc. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. Modified on 1/30/2024 (kdw). (Entered: 01/29/2024) |
| 01/29/2024 | 35 | ORDER granting 41 Motion to Appear Pro Hac Vice by Attorney Mitchell on behalf of defendant Nintendo of America Inc. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. Modified on 1/30/2024 (kdw). (Entered: 01/29/2024) |
| 01/29/2024 | 36 | NOTICE STRIKING ELECTRONICALLY FILED DOCUMENTS striking 33 Motion to Appear Pro Hac Vice filed by Nintendo of America, Inc., 32 Motion to Appear Pro Hac Vice filed by Nintendo of America, Inc. Login information used and signature on document do not match. Document shall be re-filed using the appropriate credentials. When re-filing the motions please skip the payment part to proceed. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 01/29/2024) |
| 01/29/2024 | 37 | MOTION to Appear Pro Hac Vice by Attorney Brian M. Willen $200 fee paid,receipt number AILSDC-5295938 by on behalf of Google, LLC. (Willen, Brian) (Entered: 01/29/2024) |
| 01/29/2024 | 38 | MOTION to Appear Pro Hac Vice by Attorney Christopher Chiou $200 fee paid,receipt number AILSDC-5295960 by on behalf of Google, LLC. (Chiou, Christopher) (Entered: 01/29/2024) |
| 01/29/2024 | 39 | MOTION to Appear Pro Hac Vice by Attorney Jeremy Paul Auster $200 fee paid,receipt number AILSDC-5295969 by on behalf of Google, LLC. (Auster, Jeremy) (Entered: 01/29/2024) |
| 01/29/2024 | 40 | MOTION to Appear Pro Hac Vice by Attorney Alison I. Stein by on behalf of Nintendo of America, Inc.. (Stein, Alison) (Entered: 01/29/2024) |
| 01/29/2024 | 41 | MOTION to Appear Pro Hac Vice by Attorney Cayman Mitchell by on behalf of Nintendo of America, Inc.. (Mitchell, Cayman) (Entered: 01/29/2024) |
| 01/30/2024 | 42 | ORDER granting 37 Motion to Appear Pro Hac Vice by Attorney Willen on behalf of defendant Google LLC. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 01/30/2024) |
| 01/30/2024 | 43 | ORDER granting 38 Motion to Appear Pro Hac Vice by Attorney Chiou on behalf of defendant Google LLC. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 01/30/2024) |
| 01/30/2024 | 44 | ORDER granting 39 Motion to Appear Pro Hac Vice by Attorney Auster on behalf of Google LLC. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 01/30/2024) |
| 01/30/2024 | 45 | NOTICE OF MODIFICATION re 34 and 35 Order on Motion to Appear Pro Hac Vice, 34 . Corrected motions filed at docs 40 and 41 . Orders have been modified to reflect the correct documents. No further action is required by the filer in relation to this notification. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 01/30/2024) |

| 01/31/2024 | 46 | MOTION to Appear Pro Hac Vice by Attorney David Sneed $200 fee paid,receipt number AILSDC-5299208 by on behalf of Microsoft Corporation, Mojang Studios. (Sneed, David) (Entered: 01/31/2024) |
|---|---|---|
| 01/31/2024 | 47 | MOTION to Appear Pro Hac Vice by Attorney Kathryn Cahoy $200 fee paid,receipt number AILSDC-5299221 by on behalf of Microsoft Corporation, Mojang Studios. (Cahoy, Kathryn) (Entered: 01/31/2024) |
| 01/31/2024 | 48 | MOTION to Appear Pro Hac Vice by Attorney Gary Rubman $200 fee paid,receipt number AILSDC-5299267 by on behalf of Microsoft Corporation, Mojang Studios. (Rubman, Gary) (Entered: 01/31/2024) |
| 01/31/2024 | 49 | MOTION to Withdraw as Attorney by Nintendo of America, Inc.. (Allen, Nicole) (Entered: 01/31/2024) |
| 02/01/2024 | 50 | ORDER granting 46 Motion to Appear Pro Hac Vice by Attorney David Sneed on behalf of defendants Microsoft Corporation, Mojang Studios. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/01/2024) |
| 02/01/2024 | 51 | ORDER granting 47 Motion to Appear Pro Hac Vice by Attorney Kathryn Cahoy on behalf of defendants Microsoft Corporation, Mojang Studios. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/01/2024) |
| 02/01/2024 | 52 | ORDER granting 48 Motion to Appear Pro Hac Vice by Attorney Gary Rubman on behalf of defendants Microsoft Corporation, Mojang Studios. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/01/2024) |
| 02/01/2024 | 53 | ORDER: 49 Motion to Withdraw as Attorney is **GRANTED**. Attorney Nicole A. Allen terminated. Defendant Nintendo of America Inc. will continue to be represented by Megan B. Poetzel, Cayman C. Mitchell, and Alison I. Stein. Signed by Judge Stephen P. McGlynn on 2/1/2024. (trf) THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/01/2024) |
| 02/02/2024 | 54 | MOTION to Appear Pro Hac Vice by Attorney Ambika Kumar $200 fee paid,receipt number AILSDC-5301913 by on behalf of Microsoft Corporation, Mojang Studios. (Kumar, Ambika) (Entered: 02/02/2024) |
| 02/05/2024 | 55 | ORDER granting 54 Motion to Appear Pro Hac Vice by Attorney Kumar on behalf of defendants Microsoft Corporation and Mojang Studios. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/05/2024) |
| 02/05/2024 | 56 | MOTION to Appear Pro Hac Vice by Attorney Adam Sieff $200 fee paid,receipt number BILSDC-5302785 by on behalf of Microsoft Corporation, Mojang Studios. (Sieff, Adam) (Entered: 02/05/2024) |
| 02/05/2024 | 57 | ORDER granting 56 Motion to Appear Pro Hac Vice by Attorney Sieff on behalf of defendant Microsoft Corporation and Mojang Studios. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/05/2024) |
| 02/06/2024 | 58 | MOTION to Appear Pro Hac Vice *for Epic Games, Inc.* by Attorney Moez M Kaba $200 fee paid,receipt number AILSDC-5304385 by on behalf of Epic Games, Inc.. (Kaba, Moez) (Entered: 02/06/2024) |

| 02/06/2024 | 59 | MOTION to Appear Pro Hac Vice *for Epic Games, Inc.,* by Attorney Allison Libeu $200 fee paid,receipt number AILSDC-5304389 by on behalf of Epic Games, Inc.. (Libeu, Allison) Modified on 2/6/2024 (tkm). (Entered: 02/06/2024) |
| --- | --- | --- |
| 02/06/2024 | 60 | ORDER granting 58 Motion to Appear Pro Hac Vice for Attorney Kaba on behalf of Epic Games, Inc.; granting 59 Motion to Appear Pro Hac Vice for Attorney Libeu on behalf of Epic Games, Inc., on 2/6/2024. (tkm)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/06/2024) |
| 02/06/2024 | 61 | MOTION to Appear Pro Hac Vice *for Epic Games, Inc.* by Attorney Adam Minchew by on behalf of Epic Games, Inc.. (Minchew, Adam) (Entered: 02/06/2024) |
| 02/06/2024 | 62 | MOTION to Appear Pro Hac Vice *for Epic Games, Inc.* by Attorney Padraic Foran by on behalf of Epic Games, Inc.. (Foran, Padraic) (Entered: 02/06/2024) |
| 02/07/2024 | 63 | ORDER granting 61 Motion to Appear Pro Hac Vice by Attorney Minchew on behalf of defendant Epic Games. (aca)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/07/2024) |
| 02/07/2024 | 64 | ORDER granting 62 Motion to Appear Pro Hac Vice by Attorney Foran on behalf of the defendant Epic Games. (aca)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/07/2024) |
| 02/07/2024 | 65 | NOTICE of Appearance by Christopher J. Schmidt on behalf of Google, LLC (Schmidt, Christopher) (Entered: 02/07/2024) |
| 02/07/2024 | 66 | NOTICE of Appearance by Seth Reid on behalf of Google, LLC (Reid, Seth) (Entered: 02/07/2024) |
| 02/09/2024 | 67 | MOTION to Appear Pro Hac Vice by Attorney Tina Bullock $200 fee paid,receipt number AILSDC-5308146 by on behalf of Cynthia Jiminez. (Bullock, Tina) (Entered: 02/09/2024) |
| 02/09/2024 | 68 | ORDER granting 67 Motion to Appear Pro Hac Vice by Attorney Bullock on behalf of Plaintiff Cynthia Jiminez. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/09/2024) |
| 02/09/2024 | 69 | Federal Rule of Civil Procedure 7.1 Disclosure Statement by Google, LLC identifying Corporate Parent XXVI Holdings Inc., Corporate Parent Alphabet, Inc for Google, LLC. (Schmidt, Christopher) (Entered: 02/09/2024) |
| 02/12/2024 | 70 | NOTICE of Appearance by Morgan Elizabeth Fox on behalf of Roblox Corporation (Fox, Morgan) (Entered: 02/12/2024) |
| 02/23/2024 | 71 | MOTION to Appear Pro Hac Vice by Attorney Danielle Ward Mason by on behalf of Cynthia Jiminez. (Mason, Danielle) (Entered: 02/23/2024) |
| 02/26/2024 | 72 | ORDER granting 71 Motion to Appear Pro Hac Vice by Attorney Mason on behalf of Plaintiff Cynthia Jiminez. (kdw)THIS TEXT ENTRY IS AN ORDER OF THE COURT. NO FURTHER DOCUMENTATION WILL BE MAILED. (Entered: 02/26/2024) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 03/14/2024 17:01:26 | | |
| **PACER Login:** | tb103114 | **Client Code:** | 2031050 |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-03678-SPM |

| Billable Pages: | 9 | Cost: | 0.90 |
|---|---|---|---|