BEFORE THE UNITED STATES JUDICIAL PANEL

ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: VIDEO GAME ADDICTION PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 3109 |

**OPPOSITION OF DEFENDANTS ACTIVISION BLIZZARD, INC., INFINITY WARD, INC., TREYARCH CORP., SLEDGEHAMMER GAMES, INC., RAVEN SOFTWARE CORPORATION, BLIZZARD ENTERTAINMENT, INC., MICROSOFT CORPORATION, MOJANG STUDIOS, EPIC GAMES, INC., ROBLOX CORPORATION, ROCKSTAR NORTH LIMITED, ROCKSTAR GAMES, INC., TAKE-TWO INTERACTIVE SOFTWARE, INC., 2K GAMES, INC., VISUAL CONCEPTS ENTERTAINMENT STUDIOS, SONY INTERACTIVE ENTERTAINMENT LLC, NINTENDO OF AMERICA INC., GOOGLE, LLC, ELECTRONIC ARTS INC., UBISOFT DIVERTISSEMENTS, INC. D/B/A UBISOFT MONTREAL, AND UBISOFT ENTERTAINMENT TO PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

    A.    Plaintiffs' Claims ................................................................................................ 3

    B.    Litigation Status ................................................................................................. 4

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ..................................................................................................................... 7

I.    The Panel Should Not Centralize These Actions. .................................................. 7

    A.    Centralization Is Inappropriate Because of the Small Number of Actions ..................... 7

    B.    Centralization Is Not Necessary Because Informal Cooperation Will Generate the Same Efficiencies as an MDL. ................................................................................... 9

    C.    Unique Factual and Legal Issues Predominate and Weigh Against Centralization ....... 11

        1.    Range of Disparate Personal Characteristics and Alleged Injuries ..................... 12

        2.    Different Games with Differing Elements Played on Different Platforms ........... 13

        3.    Different Groups and Different Types of Defendants ......................................... 17

        4.    Potential Applicability of Different Arbitration Agreements .............................. 18

II.    Plaintiffs' Venue Recommendation Does Not Align with Section 1407's Objectives. .... 19

CONCLUSION ................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re AOL Time Warner, Inc.*,
   235 F. Supp. 2d 1380 (J.P.M.L. 2002) ..................................................................... 19

*In re Bank of Am. Fraudulent Acct. Litig.*, MDL No. 3088,
   --- F. Supp. 3d ---, 2023 WL 8538726 (J.P.M.L. Dec. 6, 2023) ............................... 7

*In re Bard Implanted Port Catheter Prod. Liab. Litig.*, MDL No. 3081,
   --- F.Supp.3d ---, 2023 WL 5065100 (J.P.M.L. Aug. 8, 2023) .................................. 8

*In re Belviq (Lorcaserin HCI) Prod. Liab. Litig.*,
   555 F. Supp. 3d 1369 (J.P.M.L. 2021) ..................................................................... 10

*In re Best Buy Co., Inc. California Song-Beverly Credit Card Act Litig.*,
   804 F. Supp. 2d 1376 (J.P.M.L. 2011) ....................................................................... 7

*Brown v. Entertainment Merchants*,
   564 U.S. 786 (2011) ................................................................................................... 4

*In re Cable Tie Patent Litig.*,
   487 F. Supp. 1351 (J.P.M.L. 1980) ............................................................................ 4

*In re Children's Pers. Care Prod. Liab. Litig.*,
   655 F. Supp. 2d 1365 (J.P.M.L. 2009) ..................................................................... 17

*In re Chrysler Pacifica Fire Recall Prod. Liab. Litig.*,
   2024 WL 868239 (E.D. Mich. Feb. 28, 2024) ......................................................... 18

*Coinbase, Inc. v. Bielski*,
   599 U.S. 736 (2023) ............................................................................................ 18, 19

*In re Covidien Hernia Mesh Prods. Liab. Litig.*,
   481 F. Supp. 3d 1348 (J.P.M.L. 2020) ....................................................................... 9

*In re CP4 Fuel Pump Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   412 F. Supp. 3d 1365 (J.P.M.L. 2019) ..................................................................... 13

*In re Credit Card Payment Prot. Plan Mktg. & Sales Pracs. Litig.*,
   753 F. Supp. 2d 1375 (J.P.M.L. 2010) ..................................................................... 17

*In re Credit Union Checking Acct. Overdraft Litig.*,
   158 F. Supp. 3d 1363 (J.P.M.L. 2016) ..................................................................... 10

*In re Cymbalta (Duloxetine) Prod. Liab. Litig.*,
   65 F. Supp. 3d 1393 (J.P.M.L. 2014) ......................................................................... 9

*In re Electrolux Dryer Prod. Liab. Litig.*,
    978 F. Supp. 2d 1376 (J.P.M.L. 2013)......................................................................11

*In re Eli Lilly and Co. (Cephalexin Monohydrate) Patent Litig.*,
    446 F. Supp. 242 (J.P.M.L.1978)............................................................................10

*In re Gerber Probiotic Prod. Mktg. & Sales Pracs. Litig.*,
    899 F. Supp. 2d 1378 (J.P.M.L. 2012)......................................................................11

*In re Hotel Indus. Sex Trafficking Litig.*,
    433 F. Supp. 3d 1353 (J.P.M.L. 2020)..................................................................8, 16

*In re Hyundai and Kia GDI Engine Mktg., Sales Prac. & Prod. Liab. Litig.*,
    412 F. Supp. 3d 1341 (J.P.M.L. 2019)......................................................................8

*In re Maybelline New York & L'Oréal Paris Cosmetic*
*Prod. Mktg. & Sales Prac. Litig.*,
    949 F. Supp. 2d 1367 (J.P.M.L. 2013)....................................................................10

*In re Nat'l Sec. Agency Telecomms. Records Litig.*,
    444 F. Supp. 2d 1332 (J.P.M.L. 2006)....................................................................20

*In re Nine West LBO Sec. Litig.*,
    464 F. Supp. 3d 1383 (J.P.M.L. 2020)....................................................................19

*In re Paycheck Prot. Program Agent Fees Litig.*,
    481 F. Supp. 3d 1335 (J.P.M.L. 2020)....................................................................17

*In re Qualitest Birth Control Prod. Liab. Litig.*,
    38 F. Supp. 3d 1388 (J.P.M.L. 2014)........................................................................8

*Ramos v. Town of Vernon*,
    353 F.3d 171 (2d Cir. 2003)....................................................................................13

*In re Refco Sec. Litig.*,
    530 F. Supp. 2d 1350 (J.P.M.L. 2007)....................................................................20

*Sanders v. Acclaim Ent., Inc.*,
    188 F. Supp. 2d 1264 (D. Colo. 2002)......................................................................4

*In re Secondary Ticket Mkt. Refund Litig.*,
    481 F. Supp. 3d 1345 (J.P.M.L. 2020)....................................................................16

*In re Shoulder Pain Pump-Chondrolysis Prods. Liab. Litig.*,
    571 F. Supp. 2d 1367 (J.P.M.L. 2008)..............................................................11, 18

*In re Soc. Media Adolescent Addiction Prod. Liab. Litig.*,
    637 F. Supp. 3d 1377 (J.P.M.L. 2022)....................................................................16

*In re Sorin 3T Heater-Cooler Sys. Prod. Liab. Litig.*,
    273 F. Supp. 3d 1357 (J.P.M.L. 2017)......................................................................9

*In re Spray Polyurethane Foam Insulation Prod. Liab. Litig.*,
    949 F. Supp. 2d 1364 (J.P.M.L. 2013)....................................................................11

*In re Teamster Car Hauler Prod. Liab. Litig.*,
    856 F. Supp. 2d 1343 (J.P.M.L. 2012)....................................................................12

*In re Transocean Ltd. Sec. Litig. (No. II)*,
    753 F. Supp. 2d 1373 (J.P.M.L. 2010)......................................................................7

*In re Truvia Nat. Sweetener Mktg. & Sales Pracs. Litig.*,
    996 F. Supp. 2d 1377 (J.P.M.L. 2014)....................................................................11

*In re Uber Techs., Inc., Data Sec. Breach Litig.*,
    304 F. Supp. 3d 1351 (J.P.M.L. 2018)....................................................................19

*In re Uber Techs., Inc., Wage & Hour Employment Pracs. Litig. (No. II)*,
    254 F. Supp. 3d 1376 (J.P.M.L. 2017)....................................................................10

*In re Varsity Spirit Athlete Abuse Litig.*,
    677 F. Supp. 3d 1376 (J.P.M.L. 2023)..........................................................8, 10, 17

*Wilson v. Midway Games, Inc.*,
    198 F. Supp. 2d 167 (D. Conn. 2002)........................................................................4

*In re Yellow Brass Plumbing Component Prod. Liab. Litig.*,
    844 F. Supp. 2d 1377 (J.P.M.L. 2012)..................................................................8, 18

**Statutes**

28 U.S.C. § 1404(a) ..............................................................................................1, 5, 11

28 U.S.C. § 1407(a) ..............................................................................................1, 7, 19

**Other Authorities**

American Psychiatric Association, Internet Gaming,
    https://www.psychiatry.org/patients-families/internet-gaming (last visited
    January 24, 2024)......................................................................................................3

*HarrisMartin's Webinar Series: Video Game Addiction Product Liability*
    *Litigation* (Mar. 29, 2024),
    https://www.harrismartin.com/conferences/426/Webinar_VideoGame_March
    2024/agenda/ ............................................................................................................6

## INTRODUCTION

Plaintiffs ask the Panel to create an MDL to manage six cases where Plaintiffs allege disparate physical, mental, and developmental injuries they claim were caused by so-called "video game addiction." But an MDL is not needed to manage these filings. The handful of matters presented here do not justify an MDL. Nor do the parties agree that an MDL would be the most efficient way to resolve these matters—every single Defendant *opposes* centralization. These cases involve myriad individualized legal and factual issues (different defendants, games, platforms, gaming histories, and arbitration agreements), and whatever cross-cutting issues they present can be handled efficiently without centralization under Section 1407.

*First*, centralization is unnecessary because the parties have proven their ability to coordinate these proceedings informally. Three of the six cases are already pending before a single federal judge, including one by inter-district transfer under 28 U.S.C. § 1404(a). And a single law firm has driven this litigation for Plaintiffs, serving as counsel in five of the cases. The parties just recently worked together to negotiate a staggered briefing schedule for Defendants' motions to compel arbitration and motions to dismiss across multiple jurisdictions, which those courts have entered. The motions to dismiss will be fully briefed in at least three cases, and the motions to compel arbitration will be fully briefed in at least two cases, before the JPML even considers Plaintiffs' transfer motion. There has been no change in the litigation that would justify upending the existing schedule and effective coordination.

*Second*, regardless of the fact that there are only a few cases and informal coordination is already occurring and working, centralization would not advance Section 1407's goals because of the nature of the Plaintiffs' claims. Plaintiffs' claims present individual legal and factual issues that would overwhelm whatever benefits could be achieved by centralization. Plaintiffs attempt to

1

create commonalities across the cases but only by overgeneralizing their claims. In actuality, the different cases involve:

1) **A Range of Disparate Personal Characteristics and Alleged Injuries**: While the cases are premised broadly on what Plaintiffs call "video game addiction," each Plaintiff alleges different physical and mental health injuries. They vary to include "shoulder and wrist pain," "poor hygiene," "lost job opportunities," "oppositional defiant disorder," and loss of "familial relationship." Additionally, Plaintiffs range from a 9-year-old and their parents to two adults.

2) **Different Games with Different Elements Played on Different Platforms**: Each Plaintiff allegedly played different sets of games, on similarly varied platforms, all of which have different in-game content and gameplay aspects. Plaintiffs identify certain aspects, such as "vibrant colors," "microtransactions," "loot boxes," "rubber-banding," and "daily quests," but these are not present in all Defendants' games or platforms. And in those games where they are present, they are not present in each version of the game that Plaintiffs allegedly played. Additionally, the games and platforms vary in each case. Thus, each Plaintiff will need to present different evidence to support varying causation theories.

3) **Different Groups and Types of Defendants**:[1] These cases involve not just different rosters of defendants, but different categories of defendants—namely, game developers (content creators), operators of video game platforms (software or online systems on which the games can be played), and operators of online "app" platforms, including some that are not specifically "video game platforms." Plaintiffs allege unique facts as to each category and each Defendant. Moreover, the majority of Defendants only appear in *one* or *two* cases, further demonstrating the lack of common questions among cases.

4) **Potential Applicability of Different Arbitration Agreements**: Many Defendants have arbitration agreements (with class and joint action waivers) that govern Plaintiffs' claims and require Plaintiffs to pursue their claims in individual arbitrations. Defendants' motions to compel arbitration require an evaluation based on the facts of each case, and each arbitration agreement and should remove them from federal court altogether. Only if Defendants' arbitration motions are denied and those denials are upheld on appeal may Plaintiffs pursue a consolidated action in court.

---

[1] Defendants currently named in cases are: Activision Blizzard, Inc.; Infinity Ward, Inc.; Treyarch Corp.; Sledgehammer Games, Inc.; Raven Software Corporation; Microsoft Corporation; Epic Games, Inc.; Roblox Corporation; Rockstar North Limited; Rockstar Games, Inc.; Take-Two Interactive Software, Inc.; Sony Interactive Entertainment LLC; Nintendo of America Inc.; Google, LLC; Apple Inc.; BlueStacks by now.gg, inc. d/b/a BlueStacks; Electronic Arts Inc.; Ubisoft Divertissements, Inc. d/b/a Ubisoft Montreal; Ubisoft Entertainment; Mojang Studios; 2K Games, Inc.; Visual Concepts Entertainment Studios; Blizzard Entertainment, Inc.; MSI Computer Corporation.

All of this would create significant inefficiencies and delays in an MDL, defeating the purpose of Section 1407.

Establishing an MDL would be counterproductive to the goals of convenience and efficiency where the process is working. The Panel should deny Plaintiffs' transfer motion.

## BACKGROUND

### A.    Plaintiffs' Claims

Video games are a popular form of entertainment played by more than two-thirds of Americans. *See* First Am. Compl. ("FAC") ¶ 190, *Dunn v. Activision Blizzard, Inc.*, No. 3:23-cv-224-JM (E.D. Ark.) ("*Dunn*"), Dkt. 2. As technology has developed, video games—and their players—have benefited from "a staggering amount of content" and incredible complexity, "[f]rom open-world games with hundreds of square miles to explore to role playing games ('RPGs') that can take hundreds of hours" to complete. *Id.* ¶ 87. Developers regularly create "more game content" to keep players "challenge[d] throughout a game," *id.* ¶¶ 174, 179, publishing "engaging and fresh features" like "new maps" and other design elements, *id.* ¶ 282.

Plaintiffs assert a wide variety of claims—including strict product liability, negligence, fraud, and misrepresentation—against dozens of companies involved in "the design, development, manufacture, publishing, marketing, supply, and sale" of video games. Transfer Mot. at 2. Plaintiffs claim that video games cause "video game addiction," resulting in various physical and mental-health injuries. *Id*. The United States scientific community, however, has not embraced Plaintiffs' theory of causation—among other things, disagreeing as to whether "video game addiction" or "internet gaming disorder" are accepted diagnoses, but rather acknowledging the latter only as a "condition for further study." *Dunn* FAC ¶ 198; *see* American Psychiatric Association, Internet Gaming, https://www.psychiatry.org/patients-families/internet-gaming (last visited January 24,

2024) (explaining that "[w]hether internet gaming should be classified as an addiction/mental disorder is the subject of much debate"). Even if such a theory were generally accepted, the question of causation may in certain instances depend on whether and how a plaintiff's individual circumstances (e.g., age, gameplay, preexisting conditions) relate to a unique set of alleged injuries.

Plaintiffs' strategy—seeking tort liability for alleged harms from video games—is not new. Over the years, other plaintiffs have brought similar claims focused on video games allegedly causing compulsive use and harmful behavior. Like those claims, these claims suffer from multiple legal and pleading shortcomings—most notably that video games are expressive speech protected by the First Amendment. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790, 795 (2011); *see also, e.g.*, *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 169-71 (D. Conn. 2002) (rejecting design-defect claim that a teenager became "addicted to [the] video game" *Mortal Kombat* and attacked the plaintiff's son because of the game); *Sanders v. Acclaim Ent.*, *Inc.*, 188 F. Supp. 2d 1264, 1268, 1279 (D. Colo. 2002) (dismissing claims by victims of school shooting against video game publishers).

### B.    Litigation Status

The Bullock Ward Mason firm ("the Bullock firm") filed the first case in the Eastern District of Arkansas in October 2023 (*Dunn*), alleging that four different video games (each developed and published by different companies) and three distinct platforms on which the games are available caused a 13-year-old and his parents' various injuries. The Bullock firm filed three additional cases in November and December 2023 on behalf of different Plaintiffs that involved additional, unrelated games and platforms: *Johnson* (W.D. Ark.), *Jimenez* (S.D. Ill.), and *Angelilli* (N.D. Ill.).[2] Each of these cases involves Plaintiffs of different ages (ranging between 9 and 21) who played different combinations of games at different times and a different roster of Defendants

---

[2] The Bullock firm filed one other case in Washington state court in January 2024, but has not yet served any Defendants.

based on the platforms and games allegedly used and played by each Plaintiff.

In January 2024, the parties coordinated on a stipulated schedule for motions to compel arbitration and motions to dismiss across the four served federal cases. Defendants accommodated Plaintiffs' request for staggered opposition deadlines for individual motions to compel arbitration and joint motions to dismiss.[3] As the parties agreed, the schedule "allow[s] the parties to brief complex issues in a coordinated and efficient manner, which ultimately will conserve party and judicial resources and will not prejudice any party."[4] Each court entered the parties' agreed schedule as follows:[5]

|  | *Dunn* | *Johnson* | *Jimenez* | *Angelilli* |
|---|---|---|---|---|
| Motions to dismiss and compel arbitration | Feb. 23 | Mar. 8 | Mar. 29 | Apr. 19 |
| Omnibus opposition to motions to dismiss | Mar. 29 | Apr. 12 | May 3 | May 24 |
| Individual oppositions to motions to compel arbitration | Apr. 12 | Apr. 26 | May 17 | June 7 |
| Omnibus replies ISO motions to dismiss | Apr. 19 | May 3 | May 24 | June 14 |
| Individual replies ISO motions to compel arbitration | May 3 | May 17 | June 7 | June 28 |

In February 2024, Chief Judge Susan Hickey of the Western District of Arkansas *sua sponte* transferred the *Johnson* case under 28 U.S.C. § 1404(a) to Judge James Moody in the Eastern District of Arkansas. *See Johnson*, Dkt. 59 ("For the convenience of the parties and in the interest of justice and judicial economy, the Court finds that this case should be transferred. *See* 28 U.S.C.A. § 1404(a).").

---

[3] Defendants Ubisoft Divertissements and Ubisoft Entertainment, which are named in *Dunn* only, were not parties to the stipulated schedule because they had not been served at the time that schedule was being negotiated. The Ubisoft Defendants joined in the other Developer Defendants' motion to dismiss in *Dunn* on April 4, 2024.

[4] *Dunn*, Dkt. 25; *Johnson v. Activision Blizzard, Inc.*, No. 3:24-cv-26-JM (E.D. Ark.) ("*Johnson*"), Dkt. 65; *Jimenez v. Microsoft Corp.*, No. 3:23-cv-3678-SPM (S.D. Ill.) ("*Jimenez*"), Dkt. 26; *Angelilli v. Activision Blizzard, Inc.*, No. 1:23-cv-16566-MSS (N.D. Ill.) ("*Angelilli*"), Dkt. 47.

[5] *Dunn*, Dkt. 36; *Johnson*, Dkt. 71; *Jimenez*, Dkt. 30; *Angelilli*, Dkt. 58.

Defendants filed motions to compel arbitration and motions to dismiss in *Dunn* and *Johnson* in the Eastern District of Arkansas in late February and early March, per the agreed schedule.[6] After Defendants filed their motions, the Bullock firm, supported by local counsel, filed the fifth federal case (*Glasscock* (W.D. Mo.)). One day later, Plaintiffs filed their transfer motion. (*See* Dkt 1.)

Plaintiffs then immediately moved to stay the agreed schedules in *Dunn*, *Johnson*, *Jimenez*, and *Angelilli* pending the outcome of their transfer motion. After briefing, the courts in *Dunn* and *Angelilli* denied Plaintiffs' motions to stay.[7] The motions to stay in *Johnson* and *Jimenez* remain pending. Briefing on Defendants' motions to compel arbitration and motions to dismiss in *Dunn* will finish by May 3. The *Jimenez* Defendants filed their motions to compel arbitration and motions to dismiss on March 29.[8] And in less than two weeks, the *Angelilli* Defendants will file their responsive pleadings.

While Plaintiffs promised that a deluge of cases would follow "by the day," Transfer Mot. at 5, they have filed only *one* additional case since moving nearly a month ago to centralize— bringing the nationwide total of federal cases to just six cases. (*See* Dkt. 1-2 (Ex. B) (listing five of the six cases, all filed by Plaintiffs' counsel); *see also Donerson v. Epic Games, Inc.*, No. 24-cv-41 (E.D. Ark.) (filed Mar. 18, 2024)). *Donerson* was filed by counsel who are coordinating with the Bullock firm.[9] *Donerson* also has been transferred to Judge Moody. *Donerson*, Dkt. 3 at 1.

## LEGAL STANDARD

The Panel may centralize civil cases for coordinated pretrial proceedings when: (a) transfer

---

[6] *Dunn*, Dkts. 90-98; 100-105; *Johnson*, Dkts. 91-98; 101; 103-107.

[7] *Dunn*, Dkt. 118; *Angelilli*, Dkt. 105.

[8] *Jimenez*, Dkts. 85-87; 89-97.

[9] Counsel in *Donerson* and the Bullock firm are closely coordinating, as demonstrated by a recent webinar presented by members of both sets of law firms. *HarrisMartin's Webinar Series: Video Game Addiction Product Liability Litigation* (Mar. 29, 2024), https://www.harrismartin.com/conferences/426/Webinar_VideoGame_March2024/agenda/.

"will promote the just and efficient conduct of such actions," (b) the cases "involv[e] one or more common questions of fact," and (c) transfer will further "the convenience of parties and witnesses." 28 U.S.C. § 1407(a). As movants, Plaintiffs bear the burden of showing Section 1407's requirements have been met. *In re Cable Tie Patent Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980). As the Panel has repeatedly emphasized, "centralization under Section 1407 should be the last solution after considered review of all other options." *In re Best Buy Co., Inc. California Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011).

## ARGUMENT

### I.    The Panel Should Not Centralize These Actions.

The underlying actions here are ill-suited for centralization. Centralizing the cases would frustrate, rather than further, Section 1407's goals of promoting "the convenience of parties and witnesses" and "the just and efficient conduct of the actions."

#### A.    Centralization Is Inappropriate Because of the Small Number of Actions.

Centralization is not warranted because of the small number of actions. In similar situations, "[w]here only a minimal number of actions are involved, the moving party generally bears a heavier burden of demonstrating the need for centralization." *In re Transocean Ltd. Sec. Litig. (No. II)*, 753 F. Supp. 2d 1373, 1374 (J.P.M.L. 2010). The Panel has recently held other movants to this "heavy burden" standard where—as here—the case count is in single digits. *E.g.*, *In re Bank of Am. Fraudulent Acct. Litig.*, MDL No. 3088, --- F. Supp. 3d ---, 2023 WL 8538726, at *1 (J.P.M.L. Dec. 6, 2023) (denying petition to centralize six actions).

With only six cases pending in federal court—three of which are before one judge—centralization is unjustified. *See, e.g.*, *In re Varsity Spirit Athlete Abuse Litig.*, 677 F. Supp. 3d 1376, 1377–78 (J.P.M.L. June 5, 2023) (rejecting centralization of nine actions pending in six

districts). On the rare occasions the Panel has centralized fifteen or fewer subject actions, the subject actions tended to involve class actions or personal injury cases with a large volume of tag-along cases, *see, e.g., In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 410 F. Supp. 3d 1357, 1359 (J.P.M.L. 2019) (centralizing 12 class actions); *In re Bard Implanted Port Catheter Prod. Liab. Litig.*, MDL No. 3081, --- F. Supp. 3d ---, 2023 WL 5065100, at *1 (J.P.M.L. Aug. 8, 2023) (centralizing 10 personal injury cases where 38 tag-along cases were filed). Here, Plaintiffs have not met their "heavier burden . . . to demonstrate that centralization is appropriate" because "only a minimal number of actions are involved." *In re Hyundai and Kia GDI Engine Mktg., Sales Pracs. & Prod. Liab. Litig.*, 412 F. Supp. 3d 1341, 1343 (J.P.M.L. 2019).

Although Plaintiffs represented that the number of cases will grow "by the day," only one additional lawsuit has been filed in the three weeks since filing the transfer motion. Unsupported promises of additional filings do not justify creation of an MDL. *See, e.g.*, *In re Hotel Indus. Sex Trafficking Litig.*, 433 F. Supp. 3d 1353, 1356 (J.P.M.L. 2020) (explaining that "the mere possibility of additional actions does not support centralization, even where thousands of actions are predicted"); *In re Qualitest Birth Control Prod. Liab. Litig.*, 38 F. Supp. 3d 1388, 1389 (J.P.M.L. 2014) (similar); *see also In re Yellow Brass Plumbing Component Prod. Liab. Litig.*, 844 F. Supp. 2d 1377, 1379 (J.P.M.L. 2012) (denying centralization where there were 13 actions filed and 9 potentially related additional actions).

Even if more cases will be filed, it is premature at best to evaluate the convenience of an MDL or whether it will promote efficiency. The Panel cannot assess how the unknown characteristics of these unfiled cases—the allegations, defendants, plaintiffs, venues—may bear on the efficiency and convenience of centralization.

**B.      Centralization Is Not Necessary Because Informal Cooperation Will Generate the Same Efficiencies as an MDL.**

Centralization is unnecessary where, as here, the parties have shown the ability to cooperate informally. Even if additional cases are filed, the parties' demonstrated coordination justifies denying centralization. *See, e.g.*, *In re Sorin 3T Heater-Cooler Sys. Prod. Liab. Litig.*, 273 F. Supp. 3d 1357, 1358 (J.P.M.L. 2017) (denying centralization of "sixteen actions and potential tag-along actions pending in six districts" because "any overlapping pretrial proceedings have been and can continue to be handled through informal coordination"). The six pending cases were brought by the same, coordinated set of Plaintiffs' counsel. *See, e.g., In re Cymbalta (Duloxetine) Prod. Liab. Litig.*, 65 F. Supp. 3d 1393, 1394 (J.P.M.L. 2014) (denying centralization in part because "only a limited number of plaintiffs' counsel are involved in these cases."). And each Defendant is represented by the same counsel in the case(s) in which it is named. The "presence of common counsel here should facilitate informal coordination of this relatively small number of actions." *In re Covidien Hernia Mesh Prods. Liab. Litig.*, 481 F. Supp. 3d 1348, 1349 (J.P.M.L. 2020).

Indeed, Defendants' and Plaintiffs' counsel have already demonstrated the ability to do just that. The parties negotiated, agreed to, and submitted a stipulated schedule to govern the four served cases. Although Plaintiffs now complain that they "are facing the difficulties of overlapping briefing schedules," Transfer Mot. at 11, they developed and agreed to a staggered schedule with Defendants to coordinate the briefing for motions to compel arbitrations and motions to dismiss in a sensible manner. Defendants complied with that schedule and filed those motions in the first three cases (*Dunn* and *Johnson* in the Eastern District of Arkansas, and *Jimenez* in the Southern District of Illinois). Plaintiffs filed opposition briefs in *Dunn*, with their *Johnson* opposition briefs soon to follow, and in *Jimenez* a few weeks later. Despite coordinating with Defendants' counsel to develop a briefing schedule that all parties supported, Plaintiffs changed their tune and moved to stay that

schedule only after filing their transfer motion.

In similar circumstances, the Panel has found that continued "informal coordination" is appropriate rather than centralization. For example, in *In re Belviq (Lorcaserin HCl) Prod. Liab. Litig.*, 555 F. Supp. 3d 1369, 1370 (J.P.M.L. 2021), the Panel explained:

> [A] number of factors suggest that informal coordination would be practicable. All actions are in their early stages. Plaintiffs in over half the actions before us are represented by the same counsel, and four of the other actions are pending in the same district . . . . Both defendants are represented in all underlying actions by national counsel, who are coordinating.

*See also In re Uber Techs., Inc., Wage & Hour Employment Pracs. Litig. (No. II),* 254 F. Supp. 3d 1376, 1378 (J.P.M.L. 2017) ("voluntary coordination remains practicable" where "[t]here are only three actions on the motion, involving two groups of plaintiffs' firms" and "[t]hose two firms represent plaintiffs in 7 of the 13 potential tag-along actions"); *In re Varsity Spirit Athlete Abuse Litig.*, 677 F. Supp. 3d at 1378 (denying centralization where parties agreed to staggered briefing schedule and 40% of pending cases were before the same judge); *In re Credit Union Checking Acct. Overdraft Litig.*, 158 F. Supp. 3d 1363, 1364 (J.P.M.L. 2016) (finding informal coordination practicable where all plaintiffs were represented by two law firms). Continued coordination remains the most efficient process for managing the actions.

Plaintiffs' concerns about duplicative discovery—a burden that Defendants would bear— and conflicting rulings and schedules, can be addressed through continued cooperation. *See In re Maybelline New York & L'Oréal Paris Cosmetic Prod. Mktg. & Sales Prac. Litig.*, 949 F. Supp. 2d 1367, 1368 (J.P.M.L. 2013) ("the risk of duplicative discovery and inconsistent pretrial rulings can be minimized through voluntary cooperation and coordination among the parties and the involved courts."); *see also In re Eli Lilly and Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L.1978) (noting that parties could cross-notice depositions, stipulate that discovery

relevant to more than one action be usable in all those actions, seek orders from the involved courts directing coordination of pretrial efforts, or seek a stay). And, as discussed below, given that different Defendants, games, and platforms are at issue in each case, which also involves different alleged causal theories and injuries, discovery will necessarily vary case-by-case. Thus, the parties' demonstrated informal coordination weighs strongly against centralization of the actions.[10]

### C.   Unique Factual and Legal Issues Predominate and Weigh Against Centralization.

Putting aside the small number of cases and the parties' ability to coordinate informally, centralization is also inappropriate because individualized facts "will predominate over the common factual issues alleged by plaintiffs." *In re Electrolux Dryer Prod. Liab. Litig.*, 978 F. Supp. 2d 1376, 1377 (J.P.M.L. 2013) (denying centralization); *In re Spray Polyurethane Foam Insulation Prod. Liab. Litig.*, 949 F. Supp. 2d 1364, 1364 (J.P.M.L. 2013) (same). The Panel has warned against centralization where any efficiencies that might be gained would be "overwhelmed by the multiple individualized issues (including ones of liability and causation)." *In re Shoulder Pain Pump-Chondrolysis Prod. Liab. Litig.*, 571 F. Supp. 2d 1367, 1368 (J.P.M.L. 2008). That is exactly what would happen if a "video game addiction" MDL were created.

Plaintiffs' claims present many individualized factual and legal issues that weigh against centralization, including:

---

[10] Relatedly, Plaintiffs' Transfer Motion fails to analyze—or even mention—transfer under Section 1404, even though "[t]ransfer pursuant to Section 1404 and the first-to-file rule" *must* be considered before resorting to centralization under Section 1407. *In re Truvia Nat. Sweetener Mktg. & Sales Pracs. Litig.*, 996 F. Supp. 2d 1377, 1378 (J.P.M.L. 2014); *see In re Gerber Probiotic Prod. Mktg. & Sales Pracs. Litig.*, 899 F. Supp. 2d 1378, 1380 (J.P.M.L. 2012) ("[T]ransfer under Section 1404 may moot the multidistrict character of a litigation and allow a consolidated proceeding in one court with jurisdiction over the pretrial, trial, and post-trial aspects of the litigation."). Given Chief Judge Hickey's Section 1404 transfer to Judge Moody in this litigation already, Plaintiffs' failure to account for the possibility of Section 1404 transfers as a viable alternative to an MDL undermines their request for centralization.

### 1.      Range of Disparate Personal Characteristics and Alleged Injuries

While Plaintiffs argue that these litigations are simply about "video game addiction," that is not true. Each Plaintiff presents a materially distinct factual scenario—differences that are critically important when a purported medical diagnosis is involved. Plaintiffs each played different video games over different periods of time (ranging from just hours of play to an alleged timeframe of 20 years) and at different ages (ranging from 4-years old to 24-years old); they also allege a variety of mental-health diagnoses and developmental issues, all of which differ across Plaintiffs. *See In re Teamster Car Hauler Prod. Liab. Litig.*, 856 F. Supp. 2d 1343, 1343 (J.P.M.L. 2012) (denying transfer where "injuries suffered var[ied] among [the] actions" and allegations were also "based on different theories of liability"). Specifically:

- *Dunn* – Plaintiffs allege that G.D. is a 13-year-old who has been diagnosed with ADHD and dyslexia and claim injuries of "physical pain in their hands, elbow and shoulders," "morbid obesity," and "gamers' rage," among other injuries. FAC ¶¶ 235, 238.

- *Johnson* – Plaintiffs allege that Preston Johnson is a 21-year-old who "has been diagnosed with Major Depressive Disorder and Anxiety" and experienced school truancies that led to him dropping out of high school, among other injuries. Compl. ¶¶ 255, 262.

- *Jimenez* – Plaintiffs allege that I.C. is a 14-year-old who "has been diagnosed with ADHD and Depression" and claim injuries from "diminished social interactions," among other injuries. Compl. ¶¶ 235, 238.

- *Angelilli* – Plaintiffs allege that D.G. is a 9-year-old who has been diagnosed with "Oppositional Defiant Disorder" and claim injuries related to poor school performance and "a delay in speech," among others. Compl. ¶¶ 264, 269–70.

- *Donerson* – Plaintiffs allege that J.D. is a 14-year-old who "has been diagnosed [with] high blood pressure and seizures" and claim injuries of "inability to limit game playing time" and socialization issues, among other injuries. Compl. ¶¶ 275, 281.

- *Glasscock* – Plaintiffs allege that Harper Glasscock is an unemployed 24-year-old and claim injuries related to lost job opportunities and unemployment, among other injuries. Compl. ¶¶ 259, 265.

In addition, each Plaintiff's theory of causation (assuming its legal viability and that it

survives a motion to dismiss) would require Plaintiffs to present individualized factual proof. Notably, each case will require evaluating individualized facts bearing on parental decision-making, including what content they permit their children to consume. *See, e.g.*, *Ramos v. Town of Vernon*, 353 F.3d 171, 183 (2d Cir. 2003) ("[W]e cannot sit in judgment of a parental philosophy allowing late night activity, for 'between parents and judges, the parents should be the ones to choose whether to expose their children to certain people or ideas.'"). Plaintiffs' ages, which differ widely across the cases, are similarly important because the alleged games at issue have different age-appropriate ratings and different parental controls restricting gameplay (which also vary on a console-by-console basis). Thus, the wide spectrum of factual issues implicated by these alleged injuries weighs strongly against centralization. *See, e.g.*, *In re: CP4 Fuel Pump MDL*, 412 F. Supp. 3d 1365, 1367 (J.P.M.L. 2019) ("Plaintiffs' own allegations indicate that the alleged defect does not manifest itself in the same way from vehicle to vehicle, and thus that considerable discovery likely will target plaintiffs' individual – and varying – . . . experiences.").

### 2. Different Games with Different Elements Played on Different Platforms

Even if each Plaintiff's injuries were the same, their theories of causation will be dramatically different from one another. Plaintiffs' allegations are based on individual Plaintiffs' use of a dozen different games, and no case involves the same combination of games. For example, the plaintiff in *Dunn* allegedly played Battlefield, Call of Duty, Fortnite, and Rainbow Six, FAC ¶ 235; the plaintiff in *Glasscock* allegedly played Call of Duty Modern Warfare 3, Overwatch, and World of Warcraft, Compl. ¶¶ 30, 259; the plaintiff in *Jimenez* allegedly played Fortnite, Roblox,[11] and Minecraft, Compl. ¶¶ 28, 235; and the plaintiff in *Donerson* allegedly played Fortnite, Call of Duty Warzone,

---

[11] "Roblox" is not itself a game, but a platform that hosts and enables users to create their own games. Plaintiffs refer to Roblox games at times in the singular ("game") but elsewhere make clear they understand that Roblox hosts multiple games and is a "game creation system." *Jimenez* Compl. ¶ 284.

NBA 2K, Roblox, and Grand Theft Auto V, Compl. ¶ 30. Each of these games was designed with different gameplay elements, by different companies or persons, at different times. Each was distributed through different channels for use on different platforms. And each was played by Plaintiffs in different sequences, over different periods of time, and on different platforms. Plaintiffs' theories of causation will necessarily vary widely because the video games—and the platforms that host and distribute them—at issue in each case are entirely different services and programs and are not interchangeable merely because they can generally be classified as "video games," or "video game platforms."

*Different Games*. Plaintiffs' motion is based on the overly simplistic premise that because "video games" are at issue in each of these six cases, the cases involve common factual and legal issues. Transfer Mot. at 6–8. But video games are not a monolith. Their genres and nature differ both in subject matter and how players engage with them. To say that all video games are essentially the same would be like saying that all classic games and toys are essentially the same. But it would be absurd to say that building forts, capture the flag, dodgeball, chess, and basketball are similar simply because they all can be played in groups or may involve some form of competition. The video games involved here are similarly disparate: some games allow players to build virtual houses and environments; some assign players to teams that must work together to accomplish a shared objective; others involve players attempting to be the "last man standing"; and still others involve solving puzzles or playing virtual sports. Plaintiffs' complaints recognize how different the subject matter and gameplay is for these games: Plaintiffs describe, for example, Battlefield as a series of "first-person shooter video games" with a "focus on large maps, teamwork and combined arms warfare" that generally features "large-scale, online multiplayer battles," *Dunn* FAC ¶¶ 344–346; Minecraft as a "sandbox game" that allows players to explore a "blocky,

procedurally generated, three-dimensional world with virtually infinite terrain" that "can be different each time the player logs in to play" and tasks players with "surviv[ing] all the problems using specific resources," *Jimenez* Compl. ¶¶ 312–326; and NBA 2K as "a series of basketball sports simulation video games." *Donerson* Compl. ¶ 408.

*Different Gameplay Elements*. Plaintiffs allege that certain aspects of each game— including "fast-paced play," "microtransactions," "free-to-play" options, "loot boxes," and "near miss" elements—are addicting. But, again, the games are different: not all the games include each of the allegedly addicting gameplay aspects. In fact, some games do not contain any (or nearly any) of these aspects. For those games that do, they are presented differently (in terms of frequency and manner) game-by-game, and even differently between different versions of the same game. Plaintiffs do not attempt to explain why aspects of gameplay that are in some games but not others could be addicting across these litigations.

*Different Platforms*. Plaintiffs also allege a variety of ways to find, access, or play these games, including using Xbox, the PlayStation Network, the Nintendo eShop, Apple App Store, Google Play, and other platforms. Each of these platforms has its own unique design, controls, restrictions, and user experiences, and some of the platforms do not even offer certain of the games at issue. Moreover, even where the at-issue games are available on the at-issue platforms, some Plaintiffs may play a single game across multiple platforms, while others play each game on a single platform. And some of the platforms (like the Apple App Store and Google Play) are not even game-specific; they instead offer myriad online "apps" for users to download to their mobile devices, with video games being just one of countless third-party offerings. Centralizing these cases that involve different claims spanning over a dozen games, multiple game franchises, and various platforms would create a plethora of complications not present in separate actions and provide only limited efficiencies.

Superficial similarities across an entire broadly defined industry are not sufficient to establish the common issues needed to warrant centralization. *See In re Secondary Ticket Mkt. Refund Litig.*, 481 F. Supp. 3d 1345, 1346 (J.P.M.L. 2020) (absent allegations of industry-wide conspiracy, industry-wide MDL was inappropriate where "[a]ll defendants are separate businesses that employed different terms of use, different arbitration agreements, different marketing and different choice of law provisions."). The Panel has declined to centralize cases where "[m]ovants rely on broad similarities among the actions to support their request for centralization." *In re Hotel Indus. Sex Trafficking Litig.*, 433 F. Supp. 3d at 1355–56. And Plaintiffs' citation to cases involving a single incident or event, Transfer Mot. at 5–6, does not change the analysis here because these lawsuits involve an assortment of different video games, with different elements, played for different periods of time, on different platforms, that allegedly injured different plaintiffs at different times and in different ways.

These differences exceed those in other recent MDLs. For instance, when the Panel centralized the then-pending cases filed against certain "social media" companies alleging adolescent addiction and resulting mental-health harms, the cases involved only five online services and four defendants, exclusively concerned adolescent plaintiffs, and did not implicate pending motions to compel arbitration. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 637 F. Supp. 3d 1377, 1378–79 (J.P.M.L. 2022). In addition, at the time those plaintiffs filed their motion to transfer, there were nearly 20 cases already filed, and dozens more were filed by the time of the Panel hearing. Further, the lead defendant in those cases *consented* to centralization. Here, however, Plaintiffs seek to centralize claims involving a dozen different games and against various combinations of two dozen defendants—none of which consent to

centralization. Because the individual factual and legal issues will predominate over the common issues in this matter, the Panel should deny Plaintiffs' transfer motion.

### 3. Different Groups and Different Types of Defendants

Each case names different Defendants—some are named in only one of the six cases, and half of the Defendants have been named in only two or fewer cases. *See, e.g.*, *In re Varsity Spirit Athlete Abuse Litig.*, 677 F. Supp. 3d 1376, 1378 (defendants being named in only a minority of cases weighs against centralization); *In re Children's Pers. Care Prod. Liab. Litig.*, 655 F. Supp. 2d 1365, 1366 (J.P.M.L. 2009) (similar). That the majority of Defendants appear in only one or two cases further evidences the lack of common questions tying the cases together. And even where movants allege "similar policies and practices" by a group of defendants within an industry, the Panel often declines to centralize litigation involving different types of multiple defendants. *See In re Paycheck Prot. Program Agent Fees Litig.*, 481 F. Supp. 3d 1335, 1337 (J.P.M.L. 2020) ("Common factual questions are lacking, as the policies and practices for paying agent fees are unique to each lender which differ significantly across the actions."); *In re Credit Card Payment Prot. Plan Mktg. & Sales Pracs. Litig.*, 753 F. Supp. 2d 1375, 1375 (J.P.M.L. 2010) (similar).

Here, centralization is particularly inappropriate because Defendants comprise different *types* of companies that present distinct liability issues, including:

- Software game developers that design video games: e.g., Activision, Epic, EA, Rockstar, Mojang, and Ubisoft;

- Platforms that provide internet-based services and streaming that allow users to access (and, in the case of Roblox, create and share) games: e.g., Nintendo, Microsoft, Sony, and Roblox.

- Companies that operate general purpose platforms for smartphones and other devices that allow users to access third-party games: e.g., Google and Apple.

These defendants play different roles in the design, development, and dissemination of the games at issue, and these differences could affect potential claims and defenses. *See In re Shoulder Pain Pump-Chondrolysis Prods. Liab. Litig.*, 571 F. Supp. 2d at 1368 (declining to centralize cases where not all defendants were pharmaceutical companies).

### 4.      Potential Applicability of Different Arbitration Agreements

As shown by the briefing underway in *Dunn*, *Johnson*, and *Jimenez*, many—but not all—Defendants have arbitration agreements with Plaintiffs that should remove the cases from federal court.[12] That should be reason enough to deny centralization—indeed, the Panel has denied a motion to centralize where "one of the actions is being arbitrated and others could proceed to arbitration." *In re Yellow Brass Plumbing Component Prod. Liab. Litig.*, 844 F. Supp. 2d at 1378–79.

Each of Defendants' motions to compel arbitration turns on the interpretation of specific state laws, varying contract terms and provisions—for example, some agreements delegate threshold issues to the arbitrator and others do not—and the factual circumstances of each specific plaintiff. And even if the motions to compel arbitration are denied, those Defendants are entitled to an immediate interlocutory appeal and an automatic stay of district court proceedings. *See Coinbase, Inc. v. Bielski*, 599 U.S. 736, 743 (2023) ("Absent an automatic stay of district court proceedings, Congress's decision in §16(a) to afford a right to an interlocutory appeal would be largely nullified."); *In re Chrysler Pacifica Fire Recall Prod. Liab. Litig.*, 2024 WL 868239, at *1 (E.D. Mich. Feb. 28, 2024) (applying *Coinbase* to stay a portion of cases in an MDL subject to an

---

[12] In these cases, Epic Games, Inc., Microsoft Corporation, Mojang AB, Activision Blizzard, Inc.; Infinity Ward, Inc., Sledgehammer Games, Inc., Treyarch Corp., Nintendo of America Inc., Rockstar Games Inc., Rockstar North Limited, Take-Two Interactive Software, Inc., and Electronic Arts Inc. have filed motions to compel arbitration in each of the cases they have been named.

interlocutory appeal).[13]

Each of the actions may be reasonably expected to involve at least one—and perhaps multiple—appeals of arbitrability decisions. The need to address each individual motion to compel arbitration and then apply *Coinbase* to stay proceedings pending any interlocutory appeal of those motions, vitiates any potential benefit of centralization by complicating and delaying any common pre-trial proceedings in an MDL. For example, if a transferee court denies the motions to compel arbitration filed by Defendants with arbitration agreements and determines Plaintiffs' claims survive dispositive motions filed by Defendants without arbitration agreements, all discovery and other pretrial proceedings would need to be stayed as to the Defendants with arbitration agreements until the interlocutory appeals process is exhausted. The number of different potential tracks for addressing these issues—based on the different arbitration agreements and issues of contract formation specific to each plaintiff—would defeat the efficiencies that centralization is meant to provide.

## II.    Plaintiffs' Venue Recommendation Does Not Align with Section 1407's Objectives.

Plaintiffs' transfer motion is flawed for the additional reason that Plaintiffs seek transfer to a specific judge without even analyzing whether such transfer would align with the objectives of Section 1407. It does not. An appropriate transferee district is one that will best serve "the convenience of the parties and witnesses" and promote the "just and efficient conduct" of the proceedings. 28 U.S.C. § 1407(a); *In re AOL Time Warner, Inc.*, 235 F. Supp. 2d 1380, 1381 (J.P.M.L. 2002). In determining the appropriate transferee district, the Panel considers the "litigation's center of gravity." *In re Nine West LBO Sec. Litig.*, 464 F. Supp. 3d 1383, 1385 (J.P.M.L. 2020).

---

[13] Although some Panel decisions minimize the impact of arbitration motions on a JPML petition, most of those cases were decided before *Coinbase*, and their reasoning is in tension if not conflict with *Coinbase*. *Compare Coinbase*, 599 U.S. at 743 (requiring automatic stay of proceedings pending appeal of denial of motion to compel arbitration), *with In re Uber Techs., Inc., Data Sec. Breach Litig.*, 304 F. Supp. 3d 1351, 1354 (J.P.M.L. 2018) (not addressing stay of proceedings pending appeal).

With little explanation, much less justification, Plaintiffs suggest that an MDL be assigned to Judge Stephen Bough in the Western District of Missouri. But Judge Bough is not presiding over any cases in this litigation. The single case pending in the Western District of Missouri, filed the day before the transfer motion and yet to be served, is pending before a different judge. And while Plaintiffs promise additional filings in that district, Transfer Mot. at 12, none has occurred. Moreover, that certain Defendants are registered with and authorized to do business in Missouri, *id.*, is irrelevant to the determination of where any MDL should be venued. Plaintiffs cite no authority for such argument. And even if relevant, this certainly has no bearing on whether the cases should be transferred to Judge Bough, specifically.

Although Defendants oppose centralization, Plaintiffs' alternate suggestion of transfer to Judge Moody in the Eastern District of Arkansas is at least a more appropriate forum than the Western District of Missouri, given that the first case and two additional cases have been assigned to Judge Moody— leaving Judge Moody with half of Plaintiffs' present cases, including two cases (*Dunn* and *Johnson*) in which motions to dismiss and motions to compel arbitration have already been filed. *See In re Refco Sec. Litig.*, 530 F. Supp. 2d 1350, 1351 (J.P.M.L. 2007) (selecting the Southern District of New York as MDL forum and noting "[m]any actions are already proceeding apace in the district"); *In re Nat'l Sec. Agency Telecomms. Records Litig.*, 444 F. Supp. 2d 1332, 1335 (J.P.M.L. 2006) ("We conclude that the Northern District of California is an appropriate transferee forum in this docket because the district is where the first filed and significantly more advanced action is pending before a judge already well versed in the issues presented by the litigation.").

## CONCLUSION

Defendants respectfully request that the Panel deny Plaintiffs' transfer motion.

Dated: April 8, 2024

Respectfully submitted,

**KING & SPALDING LLP**

*/s/ Geoffrey M. Drake*
Geoffrey M. Drake
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email: gdrake@kslaw.com

*Counsel for Activision Blizzard, Inc., Blizzard*
*Entertainment, Inc., Infinity Ward, Inc., Treyarch*
*Corp., Raven Software Corporation, and*
*Sledgehammer Games, Inc.*

**COVINGTON AND BURLING LLP**

*/s/ David N. Sneed (with consent)*
David N. Sneed
One CityCenter
850 Tenth Street, NW
Washington DC 20001
Telephone: (202) 662-6000
Email: dsneed@cov.com

*Counsel for Microsoft Corporation*
*and Mojang AB*

**DECHERT LLP**

*/s/ Mark Cheffo (with consent)*
Mark Cheffo
Three Bryant Park
1095 Sixth Avenue
New York, NY 10036
Telephone: (212) 698-3500
Email: mark.cheffo@dechert.com

*Counsel for Take-Two Interactive Software, Inc.,*
*Rockstar Games, Inc., Rockstar Games UK Ltd,*
*2KGames, Inc., Visual Concepts Entertainment*
*Studios*

**HUESTON HENNIGAN LLP**

/s/ *Moez M. Kaba (with consent)*
Moez M. Kaba
523 West 6th St., Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Email: mkaba@hueston.com

*Counsel for Epic Games, Inc.*

**JENNER & BLOCK LLP**

/s/ *Megan B. Poetzel (with consent)*
Megan B. Poetzel
353 North Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Email: mpoetzel@jenner.com

*Counsel for Nintendo of America Inc.*

**MUNGER, TOLLES & OLSON LLP**

/s/ *L. Ashley Aull (with consent)*
L. Ashley Aull
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Email: Ashley.Aull@mto.com

*Counsel for Electronic Arts Inc.*

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

/s/ *Behnam Dayanim (with consent)*
Behnam Dayanim
2100 Pennsylvania Ave., N.W.
Washington, DC 20037
Telephone: (202) 339-8613
Email: bdayanim@orrick.com

*Counsel for Roblox Corporation*

**LAW OFFICES OF STEPHEN S. SMITH, P.C.**

*/s/ Stephen S. Smith (with consent)*
Stephen S. Smith
303 North Glenoaks Blvd., Suite 200
Burbank, California 91501
Telephone: (310) 955-5824
Email: ssmith@stephensmithlaw.com

*Counsel for Ubisoft Divertissements, Inc. d/b/a Ubisoft Montreal and Ubisoft Entertainment*

**WILMER CUTLER PICKERING HALE AND DORR LLP**

*/s/ Joshua H. Lerner (with consent)*
Joshua H. Lerner
1 Front Street, Suite 3500
San Francisco, CA 94111
Telephone: (628) 235-1124
Email: joshua.lerner@wilmerhale.com

*Counsel for Sony Interactive Entertainment LLC*

**WILSON SONSINI GOODRICH & ROSATI**

*/s/ Brian M. Willen (with consent)*
Brian M. Willen
1301 6th Avenue, #40
New York, New York 10019
Telephone: (212) 453-2862
Email: bwillen@wsgr.com

*Counsel for Google LLC*